JOSEPH A. SCHMID, JOHN H. McCULLEY AND JOSEPH R. POWELL, TRUSTEES (SUBSTITUTED IN PLACE OF THE CLEMENTON NATIONAL BANK), PLAINTIFFS-APPELLANTS, v. ROYDEN HAINES AND BERTHA HAINES, DEFENDANTS-RESPONDENTS.

Submitted February 15, 1935—Decided May 21, 1935.

For the appellants, *Grover C. Richman.*

For the respondents, *C. Richard Allen.*

The opinion of the court was delivered by

HEHER, J.   The Clementon National Bank sued upon twenty-five promissory notes, variously made and endorsed

by the defendants, Royden Haines and his wife, Bertha. Thirteen of the notes were in issue at the trial. Royden was the maker of eleven of these; and the Robert Coat Company, Incorporated, a corporation created under the laws of the State of New York, was the maker of the remaining two, one of which Royden endorsed. Bertha Haines endorsed all thirteen notes. These notes were discounted by the bank for the coat company; the latter received the proceeds thereof. Eleven of the notes were renewals of prior obligations; and it is conceded that Bertha endorsed the original notes after they had been discounted by the bank.

Royden answered, setting up (a) "fraud and misrepresentation" by the plaintiff bank, in that it "falsely and fraudulently advised" him that "it would be necessary for him, in order to protect himself for the advances theretofore made by him to" the coat company, to make or endorse promissory notes for that company, "so that said bank could advance further and sufficient moneys to said company;" that it "had investigated the financial standing" of the coat company, and its president, one Leibman, and that "they, or either of them, were well able to repay said advances;" and that Royden, relying upon the truth of these statements, made or endorsed the several obligations without consideration; and (b) that he became a party to the several obligations, "at the special instance and request of the plaintiff * * *, for its accommodation and for no other reason." Bertha likewise charged (a) "fraud and misrepresentation," in that she was "falsely and fraudulently advised" by plaintiff bank, "that it was necessary for the purpose of executing a chattel mortgage for the alleged purpose of protecting her husband [Royden] that she endorse certain notes," of the coat company, "then in possession of the plaintiff bank;" and that she, relying upon the truth of these statements, endorsed the notes in question, and the renewals, without consideration; and asserted that she was (b) a mere guarantor of the obligations without consideration.

On March 4th, 1933, after the institution of this action, the bank closed pursuant to the presidential proclamation of a bank holiday. A conservator was shortly thereafter

appointed under the Federal Bank Conservation act; and this was followed by a reorganization under that act, and the transfer and assignment of the notes in suit, with other assets, to the plaintiffs as trustees. The trustees were thereupon substituted as parties plaintiff.

There were cross-motions for directed verdicts in favor of the several parties. The trial judge directed a verdict in favor of Bertha, upon the ground that she was a mere guarantor, without consideration, and "the endorsement of the renewals by her did not change her original status." He denied plaintiffs' motion for a directed verdict against Royden, and submitted to the jury what he conceived to be an issue of fact respecting Royden's obligation upon the several notes, under a charge that required a verdict in favor of Royden if it were found that "his signature upon these notes as maker or endorser was for the accommodation of the Clementon National Bank." He found no evidence tending to establish the allegations of fraud; and we concur in that view. Appropriate exceptions to these rulings were taken by plaintiffs.

Neither judgment can be sustained. The trial judge should have directed a verdict against both defendants. The essential facts were not controverted; and there was therefore no issue for the determination of the jury.

These are the undisputed facts: Defendants were not induced by fraud or misrepresentation to become parties to the obligations in suit. They held title to an unimproved tract of land which they deemed suitable for a manufacturing plant. They sought out the coat company, which had a plant in the city of Camden, and offered to erect upon the tract referred to a factory building suited to its needs, if satisfactory terms could be arrived at. Negotiations ensued, in the course of which Royden requested the cashier of the Clementon bank to make inquiry as to the financial standing of the coat company. Later, when the negotiations were concluded, the bank was requested to extend credit to the coat company. This request was made by the company's officers, and also by Royden, who agreed to advance sufficient funds to defray the cost of installing machinery. It is clear he was convinced that the venture would be successful; and he was, for obvi-

ous reasons, seeking the attainment of that end. He was willing to advance money and pledge his credit to enable the company to establish itself in the new plant. His direct financial interest, of course, was the rental yield of the plant to be erected. The building was erected; and the coat company commenced operations in June, 1929. The bank, at Royden's suggestion, extended to the coat company a "line of credit" in the sum of $3,000, and had actually loaned to it $1,700, when doubts began to arise as to the financial soundness of the enterprise. It is not open to question that the bank refused to discount the company's paper unless satisfactory collateral were posted or the endorsements of the Hainses obtained.

Defendants' contention, in its essence, is that they became parties to the paper for the accommodation of the bank solely—an expedient devised to deceive the federal bank examiners—and that the notes did not create the purported obligation. We are not called upon to determine the legal sufficiency of this defense, if factually sustained. There is respectable authority for the view that an accommodation party to a note given, as is contended here, to deceive the bank examiner into a false finding as to the sufficiency of the bank's assets, is estopped from asserting such defense, especially where insolvency intervenes. This estoppel is rooted in what has been termed "good morals and sound public policy." *Putnam* v. *Chase,* 106 *Ore.* 440; 212 *Pac. Rep.* 365; *Niblack* v. *Farley,* 286 *Ill.* 536; 122 *N. E. Rep.* 160; *Bank* v. *Watson,* 99 *Kan.* 686; 163 *Pac. Rep.* 637; *Schwenker* v. *Teasdale,* 206 *Wis.* 275; 239 *N. W. Rep.* 484; *New* v. *Page,* 144 *Md.* 606; 125 *Atl. Rep.* 403; *Vallely* v. *Devaney,* 49 *N. D.* 1107; 194 *N. W. Rep.* 903. See, also, 64 *A. L. R.* 595 *et seq.*; 95 *Id.* 543. Professor Brannan, in expressing his approval of the doctrine laid down in *Niblack* v. *Farley, supra,* said: "Here because of public policy the maker must perform his apparent obligation, just as in other cases of illegality public policy is a reason for non-enforcement of an obligation." *Brannan's Negotiable Instruments Law* (4*th ed.*) 285. See, also, 28 *Yale L. J.* 823. And it has been held, as well, that evidence of such an undertaking violates

the parol evidence rule. *Bandel* v. *Shaw*, 115 *Kan.* 185; 222 *Pac. Rep.* 62. And the Supreme Court of Pennsylvania has laid down the rule that an agreement by the cashier of a bank that no effort would be made to collect from the endorsers of a note, given for the purpose of satisfying the bank examiner, was ineffective, "without affirmative proof of his authority to so contract." It was held that the cashier's "wrongful act * * * would not bind the corporation unless its board of directors had knowledge of such understanding, and ratified it * * *." *First National Bank of Greencastle* v. *Baer*, 277 *Pa.* 184; 120 *Atl. Rep.* 815.

But we need not pursue this inquiry. There is an utter absence of proof of such an understanding; and it was presumptuous to suggest it as a defense. At a meeting of the bank's board of directors, held on July 3d, 1929, it was the consensus that no further loans be made to the coat company, unless the Haineses became parties to its note obligations to the bank. The original notes to which the Haineses became parties were all made thereafter—the first on July 5th, 1929, for $750. This is the testimony given by Royden to establish his defense that he and his wife became parties to the notes for the accommodation of the bank solely: In the early part of July, 1929, about two weeks after the completion of the building and the commencement of operations by the coat company, he informed the bank's cashier that he "didn't think they [the coat company] were worthy of advancing any more money to." He had then advanced money to the company for the installation of the machinery—money borrowed by him from the bank; but he was not a party to any of its paper held by the bank. He continued: "*Q.* Did Mr. Parker [the cashier] say anything to you at that time as to the arrangements which the bank had made for the financing of the Robert Coat Company? *A.* He told me that they had made arrangements to loan them several thousand dollars. * * * I told him about I didn't think they were worthy of loaning any more money, he told me we were too heavily involved, the bank and ourselves, to stop loaning money at that time. * * * Said it would be necessary to go on and continue to loan them money to get out what had been loaned

to them. *Q.* All right; you proceed with the conversation which took place at that time. *A.* Well, I told him that I couldn't loan him any money, that I wouldn't be responsible for whatever was given to them, and he said I held a chattel mortgage on the machinery and that the bank couldn't loan them money, that the bank examiners were crowding him, that he would have to have an additional signature of mine to go on and loan them money. *Q.* What did he say about your signature? *A.* Well, he said it would be necessary for my signature to get it by the bank examiners, that I held the chattel mortgage on the machinery and that it would be necessary for me to sign the notes. *Q.* Well, did you then sign notes? *A.* I didn't sign them at that notes [*sic*], but I signed future notes that came in. *Q.* Did you have any other conversation with Mr. Parker or with any other officers of the bank *between the time of that conversation and your subsequent signing of notes for the Robert Coat Company? A. No. Q.* Was anything said at the time of your conversation with Mr. Parker about *liability on these notes? A. No."*

In a writing made and delivered by the coat company to Haines and his wife on August 15th, 1929, the former agreed "to recognize Royden and Bertha Haines as preferred creditors in that they hereby pledge themselves as mortgagor mortgaging to the mortgagee," all the personal property contained in the corporation's factory building, owned by the Haineses, including all finished garments and raw material "that at any time may be seized by the parties of the second part [the Haineses] to reimburse them *in the event that they are required to pay any notes on which they are maker or endorser for the Robert Coat Company, at Clementon National Bank,* same being essential to the security of the payment of said promissory notes," with "the right of immediate possession." Haines testified that the document was prepared by the bank's cashier, who said "he felt satisfied that the paper * * * would protect us against any losses, that is, the Clementon National Bank or myself." Haines admitted, on cross-examination, that this instrument was made and delivered, at the instance of the bank's cashier, to "protect the moneys that had been advanced," by him and

the bank; "and also to protect" him "by reason of" his *"liability on these notes that"* he *"had endorsed for the coat company."*

And, this writing being deemed insufficient, the coat company executed and delivered to Haines, under date of August 28th, 1929, a chattel mortgage to secure the payment of sixteen promissory notes in the aggregate principal sum of $6,800, made or endorsed by Haines, and made and delivered subsequent to July 3d, 1929, and discounted by the bank for the coat company. The first of these notes was dated July 5th, 1929, and the last August 24th, 1929. Haines swore, in the statutory affidavit of consideration, that the "true consideration" of the mortgage was "to secure the payment" of the mentioned sixteen promissory notes "endorsed to and discounted by Clementon National Bank aggregating sixty-eight hundred dollars made and endorsed by Royden Haines as *accommodation maker or endorser for Robert Coat Co., Inc.,* also to secure any renewals of the aforesaid notes * * *." Copies of the notes were attached. While the mortgage was drawn by the bank's attorney, Haines paid the draftsman's fee. There was also an assignment of the corporation's accounts receivable. While this assignment was not introduced in evidence, it is conceded that it was made to Haines alone, and was designed to protect him and not the bank. Haines so testified.

It is clear that the bank's aid was enlisted by Haines to enable him to consummate what he conceived would be a profitable enterprise for himself. The bank assisted in financing his end of the transaction; and he undoubtedly viewed direct financial assistance by the bank to the corporation as advantageous to himself.

It is therefore evident that the evidence did not present an issue of fact as to the relationship between the bank and the defendants, and the obligations arising from these several promissory notes. It was all one on the fact that the defendants became parties to these obligations for the sole accommodation of the coat company. The Haineses were materially interested in the success of the enterprise. The plant was erected for the use of the corporation; and Royden

Haines advanced the moneys necessary to purchase machinery. When the bank was urged to extend further credit, Mr. Haines was plainly told that further loans to the coat company, without adequate collateral or endorsements, could not be justified, and would bring the condemnation of the federal bank examiners. He eventually yielded; and he and his wife became parties to the paper, not with the understanding that no liability was thereby undertaken, but to make possible the rendition of essential financial aid to the corporation in which they were financially interested to a substantial degree. An examination of Mr. Haines' testimony discloses that he did not assert the contrary; and his sworn statement, in the affidavit of consideration, that the notes secured thereby were "made and endorsed" by him "as accommodation maker or endorser" for the coat company, demonstrates beyond peradventure that he was conscious of the obligations to the bank which he now disavows. And we have pointed to other admissions of the same character. The evidence therefore shows only a repudiation of an obligaton assumed; there is no evidence to sustain the claim that no such obligation was undertaken.

It is elemental that, unless there was evidence upon which the jury could properly proceed to find a verdict for this defendant, there was no issue for the determination of that tribunal. The essential facts are not controverted, nor can divergent inferences be reasonably drawn therefrom. Although it would not lead to a different result, we have not adopted the scintilla of evidence doctrine in this state. *Timlan* v. *Dilworth,* 76 *N. J. L.* 568; *Baldwin* v. *Shannon,* 43 *Id.* 596.

We are not required, at this time, to pass upon the validity of the claim made by Bertha that, having endorsed the original notes after delivery and discount, she was a mere guarantor thereof, without consideration, and her promises are therefore unenforceable. All the notes in suit, with the exception of two, were renewals of the original obligations; and it is conceded that these were endorsed by Bertha before delivery and discount. Such being the case, she became liable as an endorser thereon. The renewals constituted separate and inde-

pendent contracts. The consideration, in respect of these several notes, was the extension of the time for the payment of the obligation—the acceptance of the renewal in satisfaction of the matured obligation. Her status was not essentially different from that of an endorser of a renewal note, before delivery, who was not a party to the original note, or liable, by collateral agreement or otherwise, for its payment. Assuming, without deciding, that Bertha's financial interest in the successful prosecution of the enterprise was not a sufficient consideration to sustain her promise, she thereby became an accommodation endorser for the coat company within the intendment of section 29 of the Uniform Negotiable Instruments law, and a binding obligation was created in favor of a holder for value, even though no consideration moved to her. 3 *Comp. Stat., p.* 3738. An accommodation party lends his credit to another. It is collateral to the obligation of the other. It does not import a consideration moving direct to the accommodation party. The note is supported by the consideration which sustains the promise of the principal debtor—the consideration flowing to the accommodated party. The renewal notes here are supported by a sufficient consideration, *i. e.,* the surrender in each instance of the original note—and the consequent extension of the time for payment of the debt. *Travis* v. *Unkart,* 89 *N. J. L.* 571. One who becomes an accommodation party to a renewal note, at least before its delivery and acceptance, lends his credit to the accommodated party with the same force and effect as if it were an original obligation; and he is liable thereon to a holder for value.

And this is so even though, as claimed here, he was not liable on the original note, although a party to it. Forebearance to sue the party bound by the original obligation—the extension of the time for payment of the obligation—constitutes the consideration for the renewal obligation, and the accommodation party is therefore liable to a holder for value. Compare *Katz* v. *Judd,* 108 *Wash.* 557; 185 *Pac. Rep.* 613; *Brannan's Negotiable Instruments Law* (4th ed.) 272.

As to the two original notes, it may well be that if they were endorsed pursuant to a contract calling for such endorse-

ment, made prior to or contemporaneously with their discount by the bank, the endorsements are supported by a consideration, and therefore entailed the consequences of regular endorsements under the Negotiable Instruments act. But we are not, under the circumstances, obliged to deal with the question now. As to the need of an independent consideration, see *Schaus* v. *Henry,* 89 *N. J. L.* 607; *Hayden* v. *Weldon,* 43 *Id.* 128; *S. Kosson & Sons* v. *Harris,* 108 *Id.* 162; *Thomas* v. *Hoebel,* 46 *Idaho* 744; 271 *Pac. Rep.* 931. ..

Judgments reversed; and a *venire de novo* awarded.

Schmid v. Bertha Haines—

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, PARKER, LLOYD, CASE, BODINE, DONGES, HEHER, PERSKIE, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, JJ. 14.

Schmid v. Royden Haines—

*For affirmance*—THE CHANCELLOR, LLOYD, DONGES, VAN BUSKIRK, JJ. 4.

*For reversal*—THE CHIEF JUSTICE, PARKER, CASE, BODINE, HEHER, PERSKIE, KAYS, HETFIELD, DEAR, WELLS, JJ. 10.