## O'KEEFE v. EQUITABLE TRUST CO.

## SAME v. GUARANTEE TRUST CO.
### Nos. 6844, 6845.

Circuit Court of Appeals, Third Circuit.
April 13, 1939.

Bourgeois & Coulomb, of Atlantic City, N. J. (H. R. Coulomb, of Atlantic City, N. J., of counsel), for appellant.

Cole & Cole and C. L. Cole, both of Atlantic City, N. J., for appellee Guarantee Trust Co.

Moore & Butler, of Atlantic City, N. J., for appellee Equitable Trust Co.

Before BIGGS and CLARK, Circuit Judges, and KALODNER, District Judge.

CLARK, Circuit Judge.

This is one of several cases in this court disclosing the banking practices prevalent in Atlantic City during the golden (calf) era. We are in sympathy with the learned District Court in its effort to unravel equitably the tangled skeins following upon the premature departure of the horse. We cannot, however, give our approval to its sanction of the particular method employed in locking this barn or bank. On Saturday morning, January 28, 1933, the Atlantic City National Bank was the victim of a "run". The difference between a bank and a stocking being, by definition, one of liquidity, no bank can be or is expected to meet its deposits on instant demand. Their payment becomes then a race between time and confidence. In the principal case, the former seemed to be winning and confidence to require corresponding stimulus. The adrenalin was furnished as a result of some previous but undisclosed "arrange-

ment" with the Atlantic City clearing house. In material form, it consisted of a canvas sack containing fifty thousand dollars in Federal Reserve notes. Twenty thousand dollars of this amount, a transfer of funds from another account of the City of Atlantic City to an account in the troubled bank, is not in litigation. Thirty thousand dollars belonged in equal part to the two plaintiff-appellees and is the subject matter of the present suit.

The testimony is pleasing in its narrow compass and in its absence of controversy. It becomes possible, therefore, to let the purposes of the parties appear from the mouths of their human agents. In quoting, we add only what we deem to be appropriate headings and references to the findings of fact of the learned trial judge.

## A. Disposition of the Notes

### 1. Physical.

"Q. Where was the money placed that was brought into the bank? A. He was told to give it to the tellers. I don't know whether he did so, or not. I was in the back room the whole day." Record, p. 36.

"There is nothing in the testimony with relation to how the advanced money was to be handled, and there was no agreement as to segregation of said moneys, except as stated in Findings (2) and (3)." Record, p. 47, Findings of Fact No. 4.

"Mr. McMullin, the vice-president and solicitor of Bank, and apparently authorized so to do, directed that the money be given to the tellers of Bank." Record, p. 48, Findings of Fact No. 7.

### 2. Accounting.

"A. Local banks, due local banks fifty thousand dollars, and an entry of fifty thousand dollars, Guarantee Trust Company." Record, p. 28.

"The ledger of Bank contained two entries with relation to the transaction: One entry charged the $50,000 in the account under the heading 'Due Local Banks' and another entry was a credit to Guarantee of $50,000. These entries were made under date of January 28, 1933. The receiver substituted for these entries a deposit credit to the credit of the City of Atlantic City in the amount of $20,000 and $30,000 as amount due Guarantee." Record, pp. 48, 49, Findings of Fact No. 11.

## B. Use of the Notes

### 1. Physical.

"The Bank could use the whole or any part of the said fund for the purpose of paying its demanding depositors, i. e., to meet its own obligations 'if it were needed', and if 'they ran out of their own cash.'" Record, p. 47, Findings of Fact No. 2.

### 2. Psychological.

"The money was also to be used to impress Bank's customers with the fact that Bank had money available." Record, p. 47, Findings of Fact No. 3.

To continue the medical metaphor, the doctor was called in too late, and the patient bank died. The current struggle is over its insolvent estate, the plaintiff-appellees desiring a preference therein.

We think the learned trial judge placed the greater emphasis on the more difficult question. He stressed definition rather than denunciation of the transaction—technicalities of title rather than mandates of public policy. In this he may have been following counsel's lead. We say may have been because the abbreviated character of the record leaves the exact nature of the argument in the court below uncertain. We are relegated to inference from the fact that the brief here devotes only three out of twenty-five pages to the subject of public policy. This reluctance may have been due to a pardonable local pride (shame). The banking practices of Atlantic City, at least if those here portrayed are at all typical, seem to us neither admirable nor deserving of judicial approval.

As a result of this false emphasis, the learned trial judge had to meet some very tenuous and unsatisfactory distinctions. The excerpts above quoted leave no doubt of the factual intention of the litigants. It was agreed that, first, the deliveree bank was to mingle the money of the deliveror bank with its own funds; second, the deliveree bank was to display the money so mingled before the depositors of the deliveree bank for the purpose of inspiring them with confidence; third, the deliveree bank was to use the money for the payment of those depositors whose fears had not been quieted; and fourth, the deliveror bank was to be made whole by the creation of some legal obligation. This factual intention had to be given

legal implementation. Here the minds of the parties did not so clearly meet.

In disposals less than gifts (excluded by hypothesis) the parties are faced, among other things, with a choice of risks. They must estimate the chance of harm to the res or to the person. That estimation may be difficult. Will the flames be physical or financial, the thieves equipped with burglar's tools or customer's men? In the case at bar, judgment seems easy. Vaults are strong: security markets, by hypothesis, are weak. The plaintiff-appellees must have been more confident of the res than of its keeper. A gentleman learned in the law would have known that of the three Anglo-American legal relationships suggested by our facts, debt, bailment or trust, the latter two alone might effectuate this confidence.

Our legal scholar might always generally, and here particularly, with respect to the possibility of bailment, benefit by an extension of his knowledge into the civil law. We say that with some timidity, because it has been our observation that the legal profession regards any reference to comparative law as an indication of intellectual snobbery. The fact is, however, that the transmission of money, as in the principal case, affords us a typical instance of the civil law loan for consumption (mutuum, J.3.14, G.3.90, D.12.1.2.1;[1] pret de consommation, Colin and Capitant, Droit Civil Francais, Vol. 2, p. 425; Darlehen, Staudinger, Kommentar zum Bürgerlichen Gesetzbuch Vol. 2, part 2, p. 836).

In the civil law, both ancient and modern, the delivery of fungible goods is ordinarily the hallmark of a transaction which differs radically from those primarily concerned with the delivery of non-fungibiles, i. e., the loan for hire (locatio conductio, D.19.2.1, D.19.2.22.1; louage, Colin and Capitant, above cited, p. 544; Miete, Staudinger, above cited, p. 657), the loan for use (commodatum J.3.14.2, pret a usage, Colin and Capitant, above cited, p. 637; Leihe, Staudinger, above cited, p. 824) and the deposit (depositum, D.16.3.1.8, D.16.3.1.45; depot, Colin and Capitant, above cited, p. 651; Verwahrung, Staudinger, above cited, p. 1081). The difference arises from this very quality of fungibility. Each specimen is alike and can be returned in kind, quantity and quality rather than in identity. That is the obligation of the Roman Law mutuum; and that is the obligation to be inferred from the transaction in the case at bar. For the consumption of the money, in the sense of its future unavailability in specie, is clearly contemplated.

This continental background might have helped our legal friend in two ways. He would have known that the mutuum does not carry out his ideas of risk. All but one of the risks is personal. That one is the risk of depreciation (important, perhaps, in a depreciating currency) which, because of the obligation to return in genere, is upon the mutant or lender. He would have known that even if this had been otherwise, the civil law mutuum seems to have been too complicated for adoption by common law courts. So we find it universally interpreted as a sale or, in the case of money, as a debt.

"In our system of jurisprudence, mutuum, while it has some of the characteristics of bailment, partakes more largely of the nature of a sale and is so treated, since its practical effect must always be to operate as a transfer of title where chattels are deposited, and to create the relation of creditor and debtor where money is involved." 6 Am.Jur. sec. 41, p. 171, 172. And see, also, Story, Commentaries on the Law of Bailments, sec. 439, p. 398.

This general rule has, however, what one might almost call the customary hardship exceptions. We find them in two classes of cases. First, the deposit of fungible agricultural products in warehouses and, second, the deposit of money for possible consumption if the deposit is made at the request of the depositor. The warehouse rule has been referred to as an "American" mutuum, Knowlton, The American Mutuum, 1 Michigan Law Journal 341, and is well established by the authorities, 6 C.J. 1097; 6 Am.Jur. sec. 17, pp. 177, 178; 1 Williston on Sales, sec. 154, pp. 287, 288, 2nd ed. 1924. Since the hardship in these cases is the financial impossibility of assuming the risk of loss of highly inflammable goods, the legal exception is fashioned to meet it. A legal relationship which is neither the civil law mutuum nor the common law bailment, but

---

[1] In this and ensuing citations from the Roman authorities, D. represents the Digest or Pandects (book, title, fragment, and section); G. the Institutes of Gaius (book, and section), and J. the Institutes of Justinian (book, title, and section).

rather a hybrid combination of both, is devised. The bailors are held to be tenants in common of the mass, 14 Am.Jur. sec. 19, p. 89; On the Title to Grain in Public Warehouses, 6 American Law Review 450. Equally, if a deposit of money is made primarily for the accommodation of the depositor, i. e., for safekeeping, it seems unjust to impose the absolute risk of loss on the depositary until he has obtained the benefit of appropriating it to his use, if that has been permitted him. Some American cases have so held, Carlyon v. Fitzhenry, 2 Ariz. 266, 15 P. 273, 1 Am.Neg.Cas. 748; Caldwell v. Hall, 60 Miss. 330, 44 Am.Rep. 410, 1 Am.Neg. Cas. 803. In so doing, they have perhaps unconsciously followed the Roman Law rules for changing a depositum into a mutuum, D.12.1.10, D.16.3.1.34, D.12.1.9.9. And see Radin, Handbook of Roman Law, Sec. 67, p. 201. These rules were later ingrafted by some text writers and legislators upon the much disputed and probably post-classical concept of depositum irregulare, Valett (Pandekten, Vol. 2, sec. 523); Thibaut (Pandekten 8 Ed. Sec. 551); Glueck (Ausführliche Erläuterung Der Pandekten, Vol. 15, p. 154); Cohn (Endelmann's Handbuch Vol. 3, p. 925); Wenig-Ingenheim (Pandekten, 1st Ed. Vol. 2, Sec. 233); Arndt (Pandekten Sec. 286); Codex Maximilianus Bavaricus (Pt. LV Ch. 2, Sec. 8); Austrian Civil Code of 1811 (Sec. 959). And see also Colin & Capitant, Droit Civil Francais, Book 2, p. 655. They may be said to survive today in the German civil code, Secs. 700, 607, Staudinger Kommentar zum Burgerlichen Gesetzbuch pp. 838, 1098. As the deposit was at the request of the Atlantic City National Bank and was not an agricultural product, neither of these exceptions concern us, and the general rule proscribing the bailment of money for use is applicable.

■ Thus we see that the conduct of the parties fits into a recognized legal pattern. We see also that that legal pattern does not meet the present legal needs of the plaintiff-appellee banks. Do the facts permits us to amplify that conduct to fit another legal pattern? The trial court thought they did and held that plaintiff-appellees were entitled to a preference as beneficiaries of an "implied trust". We cannot agree.

Such amplification is of course legally possible:

"(1) Except as otherwise provided by statute, the manifestation of intention to create a trust may be made by written or spoken words or by conduct.

"(2) No particular form of words or conduct is necessary for the manifestation of intention to create a trust." American Law Institute, Restatement of the Law of Trusts, Vol. 1, sec. 24, p. 73.

Mr. Justice Stone, then Dean of Columbia Law School, wrote: "Litigation arises with respect to this class of transactions because one of the parties to the transaction desires to secure the benefit or to avoid the consequences of the particular legal device which he urges the court either is or is not applicable according to his special interest in it. Uncertainty in the application of the law arises, therefore, for the most part, not from doubt or uncertainty about the exact definition of the rule of law applicable in the case of any given device. The difficulty which arises is one of interpretation of the facts. Viewed objectively did the depositor in a given case intend and did the depositary intend that the latter should assume the liability of a bailee, or a fiduciary, or a trustee, or a debtor? That is to say, was it the intention that the depositary should do the particular things that the law says it is the duty of a bailee or a fiduciary or a trustee or a debtor to do, as the case may be? In the absence of express stipulation this question can be answered by inference only from the conduct of the parties interpreted in the light of custom or the established course of business in which the transaction occurs." Stone, Some Legal Problems Involved in the Transmission of Funds, 21 Columbia Law Review, 507, 509.

■ But here again we think the absence of legal advice frustrated the wishes of the parties. We have nothing but those wishes to lift the transaction from its simple groove into the more rarified and complicated atmosphere of a trust. In fact, we have rather less than nothing. Two-fifths of the amount in the very sack containing the funds in dispute was concededly a debt. There was no segregation. The whole amount was entered on the books as a debt. The same entity, the Atlantic, was slated for the unusual role of debtor for part and trustee for part. And it is difficult, if not impossible, to view the discharge of the Atlantic's own financial obligation to its withdrawing depositors as a fiduciary duty—the exercise of a right on

908

behalf of the plaintiff-appellees. See Maitland, Lectures on Equity, p. 44. In these circumstances we think that the words of Professor Bogert and of the author of Ruling Case Law are appropriate and lay down the rule of law applicable.

"The intent to create a trust must be definite and particular. It must show a desire to pass benefits through the medium of a trust, and not through some related or similar device." Bogert, Trusts and Trustees, Vol. 1, § 46, p. 200.

"An implied trust is one declared by a party, not directly, but only by implication. Where it is claimed that a trust is to be implied from the transaction the acts must be such as will admit of no other interpretation than that the creator retained no legal rights over the property, and the inference arising from the acts must be plain, that either the settlor constituted another trustee or else that he held the property himself as trustee. It would introduce a dangerous instability of titles if anything less was required, or if a voluntary trust inter vivos could be established, in the absence of express words, by circumstances capable of another construction, or consistent with a different intention." 26 R.C.L. 1200.

Our ascription of the predicament of these parties to their ignorance of the law may have indicated sympathy. Whether the tears are of the crocodile variety is not ascertainable from this record. Attempting to stop a run and restore confidence by making loans designed to increase the assets of a sister bank is assuredly a worthy, though possibly ultra vires purpose. This last depends on a particular court's theory of the solidarity of the banking community. The divided authorities are set forth and reviewed in the opinion of the New York Supreme Court in O'Connor v. Bankers Trust Co. (the Harriman bank failure), 159 Misc. 920, 289 N.Y.S. 252, affirmed 278 N.Y. 649, 16 N.E.2d 302. Beguiling innocent depositors with the hollow appearance of wealth resulting from a secret trust or bailment is most assuredly an unworthy and certainly unlawful undertaking.

The transaction in the case at bar necessarily afforded the parties little opportunity for deliberation. One remembers Charles Reade's famous account of a similar instance in his novel, "Hard Cash". A distinction may be drawn, therefore, between the original action of the plaintiff-appellees, and their subsequent claim. As the record does not disclose the responsibility for the latter, our comment is legal rather than personal.

Any citation of authority in condemnation of fraud would be an insult to a civilized legal system. The American Law Institute has framed an excellent definition.

"Misrepresentation known to be such, concealment or non-disclosure where it is not privileged; by any person intending or expecting thereby to cause a mistake by another to exist or to continue in order to induce the latter to enter into or refrain from entering into a transaction." The Restatement in the Courts (2d) 322.

It may not be amiss to trace the general principle into the particular acts.

Any easy apprehension of things as they are is the essence of intelligent judgment. As more people own the property they have in possession than otherwise, the law has increasingly placed the burden of explanation of apparent ownership on the true owner. This is the general policy of the English bankruptcy statutes, see 21 J.A.C. (1) Ch. 19, sec. 11, and of the American Recording Acts. Chattel mortgages, 1 Williston on Sales, sec. 352, p. 841; Milton v. Boyd, 49 N.J.Eq. 142, 153, 22 A. 1078; Smith v. Commercial Credit Corp., 113 N.J.Eq. 12, 165 A. 637; conditional sales, 1 Williston on Sales, sec. 327, p. 759; Le Wine, New Jersey Conditional Sales, sec. 30, p. 81.

A fortiori and without necessity of statute, this policy applies to the mens rea simulation of ownership. And again, a fortiori, will the policy apply to banks, institutions whose raison d'etre should guarantee the identity of reality and appearance. As a distinguished court and a learned professor of law put it: "The state cannot sanction any device intended to give a false appearance to a transaction or increase the apparent stability of a bank. * * * Public policy requires that a person who, for the accommodation of the bank executes an instrument which is in form a binding obligation, should be estopped from thereafter asserting that simultaneously the parties agreed that the instrument should not be enforced." Mount Vernon Trust Co. v. Bergoff, 272 N.Y. 192, 197, 5 N.E.2d 196, 197.

"Banks are permitted by law to do business and the law seeks to protect those

**909**

dealing with banks. In the interests of the public, statutes require careful examination of banking institutions so that those dealing with them are not deceived by a false appearance of solvency. For the courts to refuse to interfere in cases where the trickery of men confuses real with apparent assets, defeats the public interest which is the reason for the regulation. Public policy requires judicial interference to penalize those who make agreements to deceive examiners." 22 Iowa Law Review (note) 156, 157, 158.

As might be expected, the persons most interested and therefore most available for the rescue of an imperiled bank are those responsible for its management.

"Many banks of unquestioned present soundness were perilously close to failure during the dark days of the early thirties. To stave off disaster, directors and stockholders were in many instances prevailed upon to transfer personal notes and securities to their banks in an attempt to bolster depleted assets and relieve capital impairment." Disposition by Solvent Banks of Notes Given to Guarantee Assets (note) 48 Yale Law Journal 326, 327.

The reports contain many instances of fictitious obligations given under similar circumstances. Where the rights of depositors are involved the courts have been unanimous in defeating the fraudulent purpose by striking down the fiction, 64 A.L.R. 595, (note); 95 A.L.R. 543, (note). It is interesting to observe that the later cases place their decisions squarely on the ground of public policy and do not strain at an enlarged concept of consideration or an hypothetical estoppel. 38 Harvard Law Review 239 (note); 22 Cornell Law Quarterly 380 (note); Schmid v. Haines, 115 N.J. L. 271, 178 A. 801; American Law Institute, Restatement of Contracts, sec. 60, Illustration g; Brannon, Negotiable Instruments Law, 6th Ed., p. 459; 5 Williston on Contracts, sec. 1632, p. 4574; Zollman, Banks and Banking Vol. 7, § 4783, p. 285.

We are fortunately able to add to defendant-appellants' citation of authority on the use of the trust device for a similar purpose of deception. Clearly the offense against "good morals and sound public policy" is not lessened by the employment of an equitable device. The draftsmen of the Restatement of the Law of Trusts expressly recognize this fact.

"Except as stated in Subsection (2), an intended trust is invalid if the purpose of the settlor in creating the trust is to defraud his creditors or other persons". American Law Institute, Restatement of Trusts, Vol. 1, sec. 63 (1), p. 199.

"c. *Other fraudulent transactions.* The rule stated in Subsection (1) is applicable not only where the transfer is made for the purpose of fraudulently concealing the interest of the transferor, but also where it is made for the purpose of clothing the transferee with apparent ownership, provided that this is done for a fraudulent purpose. Thus, if one person pays money to another upon an agreement that the money will be held in trust for the payor and subsequently returned to him, and this is done for the purpose of so enhancing the credit of the payee that he will be enabled to deceive a third person and induce him to lend money to the payee, the payor cannot ordinarily enforce the intended trust." American Law Institute, Restatement of Trusts, Vol. 1, sec. 63, p. 201.

It will be noticed that the only factual difference between the real and supposititious cases is the legally irrelevant detail that here the proposed deception is also extended to depositors who have already lent money to the payee bank, and are to be thereby induced to refrain from calling their loans.

The decrees of the District Court are reversed and the causes are remanded with directions to dismiss the bills of complaint.