Lem C. BRYAN, Receiver, Appellee,

v.

Ernest A. BARTLETT, Jr., Afton Borum, Hoyt Borum, and E. M. Clem, Appellants.

Lem C. BRYAN, Receiver, Appellant,

v.

Gaylord B. ROBERSON et al., Appellees.

Nos. 19815, 19875–19880.

United States Court of Appeals, Eighth Circuit.

Nov. 30, 1970.

Rehearing En Banc Denied and Rehearing Denied Jan. 8, 1971.

---

Sam Sexton, Jr., Fort Smith, Ark., for Hoyt Borum and others.

William B. Putnam, Fayetteville, Ark., for Lem C. Bryan, etc.

Fines F. Batchelor, Jr., Van Buren, Ark., for Lee Edwards.

E. J. Ball, Fayetteville, Ark., for Charles Garner.

Before GIBSON and LAY, Circuit Judges, and HUNTER, District Judge.

GIBSON, Circuit Judge.

This is the third reported federal appeal in the financial affairs of the Arkansas Loan & Thrift Corporation, an Arkansas corporation.[1] The case involves a suit by Lem C. Bryan, the receiver[2] of AL&T against nine directors and the attorney of that corporation to recover payment on promissory notes executed by them in favor of AL&T. The defendant directors asserted the defenses of no delivery, lack of consideration, failure to have possession of the notes at the time suit was filed, and that the notes were incomplete. The receiver in turn contends that they are estopped to assert these defenses. The facts of the controversy are somewhat complicated, necessitating a detailed resumé,

Arkansas Loan & Thrift Corporation was organized to engage in consumer financing; it also sold securities and evidences of indebtedness ("thrift accounts") to the general public. Savings Guaranty Corporation was acquired by AL&T for the purpose of insuring its deposits. As of the time of the acquisition, AL&T owned a majority of Savings Guaranty's stock, 780 of the 1080 out-

---

1. The prior published reports include Securities and Exchange Commission v. Arkansas Loan & Thrift Corporation, 294 F. Supp. 1233 (W.D.Ark.1969), aff'd, sub nom., Securities and Exchange Commission v. Bartlett, 422 F.2d 475 (8th Cir. 1970) ; Securities and Exchange Commission v. Arkansas Loan & Thrift Corp., 297 F.Supp. 73 (W.D.Ark.1969), aff'd, 427 F. 2d 1171 (8th Cir. 1970).

2. Under 28 U.S.C. § 754 receivers "shall have capacity to sue in any district without ancillary appointment." This suit was brought by the receiver in the court of his appointment, upon a cause of action which he was entitled to bring, and the defendants were subject to the jurisdiction of the court. It is thus ancillary to the main suit, and jurisdiction is properly vested in the district court, regardless of diversity of citizenship or the amount in controversy. White v. Ewing, 159 U.S. 36, 15 S.Ct. 1018, 40 L.Ed. 67 (1895) ; Gibson v. Vinton, 21 F.2d 168 (8th Cir. 1927) ; United States v. Lewis, 338 F.2d 187 (6th Cir. 1964) ; 7 Moore, Federal Practice ¶ 66.07 [3].

standing shares of stock. Savings Guaranty's assets, in turn, consisted primarily of an assignment from AL&T of all of its assets. While there were some insignificant changes in personnel from time to time, for all practical purposes during the period of their joint operation the managers and directors of both corporations were the same persons. AL&T in other words was insuring itself.

In March 1968, the Securities and Exchange Commission filed suit in the Western District of Arkansas against both corporations, seeking an injunction against further corporate activity because of violations of the Securities Act of 1933, alleging that they had used the mails to sell securities not registered with the Commission (15 U.S.C. 77e(a) and 77e(c)) and had used the mails to sell securities by fraudulent means (15 U.S.C. § 77q(a)). The suit also alleged that the corporations were insolvent and sought the appointment of a receiver. The trial court granted a temporary injunction and appointed a receiver to conserve assets. It subsequently became clear that the corporations were hopelessly insolvent, and the receiver was given the authority to liquidate the assets.

Among the items which came into the receiver's possession were the ten notes sued upon in this suit. Each note was dated June 15, 1967, made payable to the order of Arkansas Loan & Thrift, in the amount of $70,400 to carry 7 per cent interest, secured by 64 shares of stock in Savings Guaranty Corporation, and was signed by a defendant. Attached to each note was a stock certificate in the amount of 64 shares of Savings Guaranty stock made out in the name of each defendant and, with one exception, endorsed by him. These notes were never carried on the books of AL&T as an asset.

It is of some importance to indicate how the receiver came into possession of these notes. The notes were dated June 15, 1967, but it is not at all clear when they were actually executed. There does seem to be agreement among the directors that they were all executed at the same time. But one of them testified that they were executed in December 1967, others said January or February of 1968, while others seemed to think it was sometime earlier than any of those dates. In any event, it is undisputed that at the time they were executed they were given into the possession of E. M. Clem, and that at the time he received possession of the notes Clem was president of Savings Guaranty. Whether he was also at that time a director of AL&T is uncertain. The record shows that he was a director of AL&T at least until January 15, 1968, and does not show that he at any time resigned that position. Clem himself testified that he was not a director of AL&T in February of 1968 and that was the approximate time he received possession of the notes. This testimony is in conflict with others who asserted that the notes were executed and given to him earlier. Pursuant to the order of the court directing all records of AL&T and Savings Guaranty be turned over to the receiver, Clem deposited these notes in the court registry.

Several other documents came into the receiver's possession which are of interest in this case. One was a stock option plan dated November 1, 1966, executed by AL&T, which granted each director of Savings Guaranty the option to purchase 65 shares of its stock owned by AL&T at a price of $1,100 per share, the option to expire June 30, 1967. The minutes of the meeting of the board of directors of Savings Guaranty for June 5, 1967, indicated that each director intended to exercise his option. The stock ledger of Savings Guaranty also showed that each director had been transferred 64 shares of stock from the holdings of AL&T. However, there appear to have been no canceled certificates or stock stubs showing this transfer.

In July 1967, the Insurance Commissioner of Arkansas became concerned about the solvency of Savings Guaranty and about the possibility that there was such an interlocking ownership of AL&T and Savings Guaranty that AL&T was in effect insuring itself. He ordered a hearing with a view to determine whether or

not Savings Guaranty's authority to operate as a guaranty company should be revoked. The hearing was held in August 1967, attended by four of the present defendants, at which time a memorandum was introduced in evidence which showed the ownership of 65 shares of Savings Guaranty stock in each of the present defendants.

It also appears from the record that at least three of the defendants represented to the SEC in depositions that the notes in question represented personal obligations to AL&T for the purchase of Savings Guaranty stock.

The defendants' explanations of the reasons for executing the notes in controversy were neither consistent nor satisfactory, but all denied receiving any consideration for them. Some contended that the notes were executed for the purpose of completing the stock option transaction, but that the stock was never delivered. Others suggested that the notes were to bolster the assets of AL&T. Others suggested that they were to get the companies out of difficulty with the authorities in Little Rock. Still others suggested that the notes were to be negotiated by AL&T in the event that a run on the deposits occurred, in which case the makers were to be given first mortgages as security, events which never occurred. None of the defendants was able to explain the presence of the stock certificates attached to the notes and endorsed by them. In addition, all of the defendants contended that the notes were never delivered to AL&T.

The receiver contends that the defendants are estopped to assert any of these defenses to liability on the notes.

■ At the outset we are confronted with the question of what law governs the issues in this case. The defendants strenuously insist that the law of Arkansas is applicable, without citing any authority. We find this proposition doubtful. Federal jurisdiction in this case is based, not on diversity of citizenship, but on a federal equity receivership arising from violation of the federal securities

regulation statutes. The receiver was appointed in this case to prevent further violations of the federal securities laws and to preserve the assets for the benefit of the investor-creditors of the companies, who are primarily individual citizens of many different states and whose financial interests were endangered by the securities law violations of the defendants. As Professor Loss points out, "[s]urely this [an SEC receivership proceeding] is an instance of the post-*Erie* survival of a 'federal common law' (in this case, equity)." 3 L. Loss, Securities Regulation 1513 n. 113 (1961).

We find no cases directly in point on this issue, but an analogy may be drawn from the case of D'Oench, Duhme & Co. v. F. D. I. C., 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). In that case, the F.D.I.C. brought suit on a note which it had acquired an asset from collateral for a loan made to a state bank. The defense of want of consideration was asserted, but the parties could not agree on which state law was to be applied to the transaction, it being alleged that under Missouri law the defense was proper, while under Illinois law the defendant would be estopped to deny liability on this ground. The Supreme Court held that the matter was not a question of state law, but of federal law. There were two reasons for this result. First, the corporation was an agency of the federal government and second, the policy underlying the Federal Reserve Act to protect the assets of public banks from misrepresentation required the questions presented to be determined by federal standards. Here the receiver, while not a federal corporation, is an officer of a federal court appointed because of violations of federal law. The policy underlying the federal Securities Act of 1933 is to protect investors from the fraudulent sale of securities and the common loss of investment which follows from violations of the act. In unsnarling the tangled affairs of these corporations to preserve insofar as possible assets for distribution to the defrauded investors, the receiver is performing a federal function. These are

substantial reasons for applying a federal rule of decision to this case.

Even if the case is deemed to be governed by Arkansas law, we have investigated the law of that state closely and find no conflict with the decision here rendered. The questions involved have not been definitively passed upon by the Arkansas courts, but there are many decisions which are consistent with the result reached by us, and they are cited where appropriate.

■ We turn now to the substantive problems involved. The first problem is that of delivery. It is a prerequisite to liability on a negotiable instrument that that instrument be delivered by the maker. The defendants contend that there was no delivery in this case. They argue that Clem held the notes solely as agent for them, that they were never delivered to AL&T, and that the receiver obtained possession only by virtue of a court order which cannot be construed as voluntary delivery. We agree that the transfer from Clem to the receiver cannot be considered to be the sort of delivery requisite to establishing the effectiveness of the notes in question. However, as we construe the facts in this case, the transfer of possession from the defendants to Clem was sufficient to constitute the necessary delivery.

In discussing this question of delivery, as well as the problem of consideration following, it should be kept in mind at all times that the defendants as directors had a fiduciary relationship to the AL&T and its investors. A director's obligation to act in utmost good faith in the operations of a company's business is most acute in transactions involving personal financial dealings with the company, for it is in these situations that the opportunities are most seriously present for acting, whether willfully or merely negligently, contrary to the interests of those they are supposed to represent.

■■ The purpose of requiring a delivery is to make manifest the intention of the maker of a note that it be operative. Thus, even though a person exe-

cutes a note in proper form, where he retains possession and control over it, it can reasonably be assumed that he did not intend for it to be effective. *See generally*, 1A Corbin, Contracts § 32 (1963). "Delivery" is defined in the NIL as a transfer of possession from one person to another (Uniform Negotiable Instruments Law § 191), and in the UCC as a voluntary transfer of possession (Uniform Commercial Code § 1–201(14)). Of course, it is an elementary principle of agency that delivery to a principal's agent is the equivalent of delivery to the principal. Scolaro v. Bellito, 184 N.E.2d 604 (Ohio App. 1962). Where an instrument is no longer in the possession of a party whose signature is on it, there is a presumption of delivery. 11 Am.Jur.2d, Bills & Notes, § 272 (1963).

■ Applying these principles to the instant case, we think it is clear that there was delivery of the notes in question to AL&T and binding instructions to that effect should have been given. The delivery by the defendants to Clem was clearly a voluntary transfer of possession. There is no conflict in the evidence as to that point. It is also clear that this transfer amounted to a relinquishment of control over the instrument. There was never any further attempt by any of the defendants to discover what was being done with the notes or to insure that they not be used for any purpose which might entail liability on their parts.

We think this delivery to Clem was the equivalent of a delivery to AL&T. While all of the defendants, including Clem, denied that at the time he received the notes Clem was an officer of AL&T, the evidence in the record indicates the contrary. The minutes of AL&T show that he was a director as of January 15, 1968, and there is no showing in the record when he resigned. The defendants testified that the notes were executed at the end of 1967 or the beginning of 1968 (they were dated June 15, 1967), or perhaps earlier, and were delivered to Clem at the time of execution. Even if we were to accept for the purposes of argu-

ment that at the time he received the notes, he was no longer a director of AL&T, it still seems to be a clear inference that he was an agent of AL&T. He had been a director of AL&T and remained president of Savings Guaranty Corporation, a company controlled by AL&T. It is evident that in putting the notes in his possession, without any further attempt at control over them, the defendants intended them to be readily accessible to AL&T for any purposes which might be deemed useful. If the defendants truly intended the notes not to be used by AL&T, or to be used for strictly limited purposes, the means were readily available to assure the limited use. They could either have not executed them until the appropriate time, or having executed them retained possession of them, or put them in the possession of a completely independent party with clearly limited instructions and authority. Since none of these things was done, and since it is clear that the defendants intended to relinquish possession and control of the notes to a person intimately associated with AL&T, the conclusion is inescapable that they were delivered to AL&T.

The defendants have contended that the receiver is not a holder of these notes because he was not in possession of them at the time he filed the suit and that he obtained possession at the time of trial only by virtue of a court order; they argue that, not being a holder, he is not entitled to sue on the notes. There is no merit to this contention, since we have concluded that the notes were delivered to AL&T. Having been delivered to AL&T prior to the receivership, hence rendering it a holder, they passed into the receiver's constructive possession upon his taking control of the property and he is therefore a holder.

Defendants also raise the contention that the notes are unenforceable because they are incomplete, citing Ark. Stat. Ann. § 85–3–115. This is a section of the Uniform Commercial Code which provides as follows:

"When a paper whose contents at the time of signing show that it is intended to become an instrument is signed while still incomplete in any necessary respect it cannot be enforced until completed. * * *."

The notes in question were dated June 15, 1967, recited a principal sum of $70,-400 at an annual interest rate of 7 per cent to be "payable in equal annual installments of principal and interest in the sum of — Dollars each on the 15th day of June, 1968 and on each anniversary date thereafter until said entire indebtedness of $70,400 and interest shall be paid in full." The only incomplete blank on the face of the note was the amount of the annual installment. We do not believe this renders the note "incomplete in any *necessary* respect." It simply indicates that annual installments were not contemplated and that the entire amount of the note was due one year after the date. Master Homecraft Co. v. Zimmerman, 208 Pa.Super. 401, 222 A.2d 440 (1966).

We turn now to the issue of lack of consideration and whether or not the defendants are estopped to deny liability on the notes on this ground. The defendants contend that there can be no estoppel in this case because there is no evidence that anyone was ever shown these notes and hence there could have been no misrepresentation by or reliance on the validity of these notes as assets of AL&T. They particularly emphasize the fact that the notes were never carried on the books of AL&T as assets.

It is true that in the ordinary case of equitable estoppel, a party relying on the principle of estoppel must show some reliance on the misrepresentation which led to a detrimental change of position. But the case law shows that this rule has no application in situations involving the giving of a note to a financial institution by an officer, director, or stockholder of that institution. Public policy forbids that such a person, having a fiduciary obligation to the company, deny the validity of an obligation which he has purported to assume for the bene-

fit of the company, regardless of whether or not anyone was affirmatively misled by his conduct. This policy is particularly apposite where the company has become insolvent and the rights of creditors and investors have been endangered.

Early cases involving this problem often spoke, not in terms of estoppel, but in terms of valid consideration. It was held that where notes were given to a bank by a director or stockholder, to cover up bad assets, but were not intended to become personal obligations, there was a valid consideration and they were binding. *See, e. g.,* Ellis v. Jonesboro Trust Co., 179 Ark. 615, 17 S.W.2d 324 (1929); Stokes v. Farmers' Bank of Hardy, 187 Ark. 682, 61 S.W.2d 680 (1933); Merchants & Farmers Bank v. Cardwell, 174 Tenn. 490, 127 S.W.2d 113 (1939).

Other cases, rather than straining to find a consideration for the note, held that the maker was estopped to assert lack of consideration as a defense where the bank was allowed to carry the note as an apparent asset. Often these cases involved an affirmative attempt to deceive bank examiners as to the solvency of the institution. It was held that such a misrepresentation as to bank assets necessarily involved detrimental reliance on the part of the public who dealt with the bank on the faith of the bank's solvency. *See, e. g.,* Bangor Trust Co. v. Christine, 297 Pa. 64, 146 A. 545 (1929); Denny v. Fishter, 238 Ky. 127, 36 S.W.2d 864 (1931); Brand v. Korth, 128 Tex. 488, 99 S.W.2d 285 (1936).

The above cited cases all involve situations where the note was carried as an apparent asset on the bank's books. We are confronted in this case with whether the fact that the notes in question were not carried on the company's books as an asset should make a difference in the application of the doctrine of estoppel. We think it does not. In the first place, notes in the possession of a company, whether carried on its books or not, may in fact be assets. In the second place, the defendants in this case were in total control of the books of AL&T, as well as Savings Guaranty, and the evidence is substantial that principles of sound accounting practices and record keeping were consistently disregarded so that the probative value of the records as to the actual status of the companies was non-existent. The defendants' own accountant testified that "their bookkeeping was very poor and sloppy; they did not follow general accepted accounting principles. * * *" Finally, much of the law in this area indicates that whether or not a note is actually carried on a bank's books or in fact causes any deception is not material to the application of an estoppel to assert the defense of lack of consideration.

One of the leading cases is Mount Vernon Trust Co. v. Bergoff, 272 N.Y. 192, 5 N.E.2d 196 (1936). In that case, the defendant, apparently innocently, executed a note to a bank and received in return a writing expressly relieving her from personal liability and looking to some assigned collateral for payment. But when the bank subsequently sued on the note, the New York Court of Appeals held that the collateral agreement was no defense, and it expressly said that whether any deception was intended or achieved by the agreement was not material.

"We are not told in this case whether the bank examiner was deceived, and indeed we do not know whether any one was deceived. * * *

" * * * The defendant may not have intended to deceive any person, but, when she executed and delivered to the plaintiff bank an instrument in the form of a note, she was chargeable with knowledge that, for the accommodation of the bank, she was aiding the bank to conceal the actual transaction. Public policy requires that a person who, for the accommodation of the bank, executes an instrument which is in form a binding obligation, should be estopped from thereafter asserting that simultaneously the parties agreed that the instrument should not be enforced." *Id.* 5 N.E.2d at 197.

The Texas Supreme Court in a case involving a note given to a trust company by a director which was carried as an ap-

parent asset, held that the note was supported by sufficient consideration because of the defendant's position with the company and also that he was estopped to assert lack of consideration because of the attempted deception. But most significantly for purposes of this case, the court gave an additional reason for its holding which is equally applicable here:

"Aside from the reasons heretofore advanced, public policy requires that we hold against the contention of the defendants in this case. A person who, for the accommodation of a corporation such as we have here, executes an instrument which is in form a binding obligation is estopped from thereafter asserting that the instrument should not be enforced because of want of consideration." Motor & Industrial Finance Corporation v. Hughes, 157 Tex. 276, 302 S.W.2d 386, 392 (1957).

Other cases in accord with this position are O'Keefe v. Equitable Trust Co., 103 F.2d 904 (3d Cir. 1939); Traylor v. Farmers Bank & Trust Co., 196 Ark. 161, 116 S.W.2d 590 (1938); Blanks v. American Southern Trust Co., 177 Ark. 832, 9 S.W.2d 310 (1928).

Professor Corbin has dealt generally with this situation in his treatise as follows:

"Whether there has been fraudulent intent or not, it would be scandalous not to enforce payment of the note, if otherwise any depositor or creditor would be a loser. Justification for such enforcement can be phrased in terms of 'estoppel' or in terms of the action in reliance by various parties. In any case, there has been no consideration in the sense of a bargained-for equivalent. In some cases the court has been content to rest its decision against the promisor on a mere appeal to the prevailing beliefs as to public policy." 1A Corbin, Contracts § 197 (1963).

See also 11 Am.Jur.2d, Bills & Notes § 243 (1963).

We have left for last discussion of the case which seems clearly dispositive of this issue, D'Oench, Duhme & Co. v. F. D. I. C., 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), discussed previously on the issue of what law should apply. The facts of that case were as follows. In 1933, the defendant executed a note to a bank in order that the bank would not have to carry on its books some past due bonds, with the understanding that the note would not be enforced against him, but any payment of the note would be made out of the proceeds of the bonds. In 1934, at a time when the bank was solvent, the F.D.I.C. insured it; at this time the bank carried the note as an asset, although the F.D.I.C. did not necessarily know that. In 1935, while it was still solvent, the bank charged off the asset on its books. In 1938, the bank became insolvent, and the F.D.I.C. made a loan to it to carry on its business, receiving as collateral an assignment of the bank's assets, including the note in question. The Supreme Court held that the maker of the note was estopped to set up the defense of no consideration, and the fact that the note was not carried as an asset at the time of its acquisition by the F.D.I.C. did not preclude the application of estoppel.

"* * * [A]n accommodation maker is not allowed that defense as against the receiver of the bank and its creditors, or at times even against the bank itself, where his act contravenes a general policy to protect the institution of banking from such secret agreements. * * *

"Furthermore, the fact that creditors may not have been deceived or specifically injured is irrelevant. * * * [I]t is the 'evil tendency' of the acts to contravene the policy governing banking transactions which lies at the root of the rule.

*     *     *     *     *     *

"* * * The fact that the note was charged off by the bank subsequent to the time when respondent insured the bank and prior to the time when it acquired the note under the loan is immaterial. A note may be nonetheless an asset though it is charged off. * * *

It is indeed clear that at no time prior to the demand for payment did respondent know that the note was not genuine. It needs no argument to demonstrate that the integrity of ostensible assets has a direct relation to solvency. And it is no * * * defense * * * that no damage was shown to have resulted from the fraudulent or unlawful act." *Id.* at 458–461, 62 S.Ct. at 680–681.

This reasoning is equally applicable to this case. Here the defendants delivered notes to AL&T which on their face constituted personal obligations to the company. They were available for the company to use for whatever purposes it saw fit. Even though not carried on the books of the company, they were nevertheless available as assets. And the fact that no specific injury or deception is shown from the use of the notes is no defense to liability. The "evil tendency" was there. Deception was practiced on a state regulatory official. The public was informed that the investment accounts were guaranteed—the only way any meaningful guarantee could be afforded was by an independent company, not one owned by AL&T, which would then be backing the investments accounts with its own assets. This constituted a fraud practiced on the public and the defendants as fiduciary directors are responsible for this deception and are estopped to deny the validity of the notes. We conclude that the defendants should all be held liable on these notes.

■ It follows from what we have said that the judgments against Bartlett, Afton Borum, Hoyt Borum and Clem should be affirmed. The judgments in favor of the other six defendants must be reversed because of error in the trial court's instruction No. 10 to the jury. This instruction permitted the jury to find no liability if they found that the defendants had no intention to purchase Savings Guaranty stock, or if they found that the notes had not been delivered to AL&T, or if they found that the defendants had not represented to the Arkansas Insurance Commissioner that they were owners of the Savings Guaranty stock. As noted above, binding instructions should have been given as to delivery. It is no defense to these notes that the defendants did not intend to purchase Savings Guaranty stock, that they received no consideration for the notes, or that no one was specifically deceived by the notes.

■ Certain additional comments may be made as to defendants Garner and Edwards. Defendant Garner was not a director of either corporation, but he was attorney for both and was intimately connected with the affairs of both. His fiduciary duties were of the same status as that of the directors. We think the language of the Utah Supreme Court is apt here. "One who aids an officer and director of a bank to violate the law and betray his trust, as was done in this case, is in no position to assert lack of consideration when the bank sues to recover on the note which was knowingly given * * *." Bank of Commerce v. Seely, 23 Utah 2d 271, 462 P.2d 154, 155 (1969). We view Garner as serving in the same fiduciary capacity as the directors and thus estopped from asserting the defense of lack of consideration and any other defenses denied the directors.

■ Defendant Edwards testified that he executed the note bearing his signature and delivered it to Clem. At the time he executed it, it did not recite that it was secured by Savings Guaranty stock, and that was added without his authorization sometime later. The attached stock certificate with his signature is an admitted forgery. However, we do not think this operates to relieve him from liability. In the first place, we attach no significance to the fact that the stock certificates were attached to the notes, except for the fact that they are some indication that deception was the intent of these notes. But the notes could be equally deceptive without the certificates, and the crucial fact here is that the defendants signed and delivered notes representing personal obligations to the company. Since the execution and delivery of the note is admitted, Edwards should be held liable.

38

The judgments against defendants Bartlett, Afton Borum, Hoyt Borum, and Clem are affirmed. The judgments against the plaintiff and in favor of defendants Roberson, Michler, Ingram, Jeryo, Edwards, and Garner are reversed. Upon the record made, the trial court erred in denying the plaintiff's motion for a directed verdict as to all defendants. The case is remanded with instructions to vacate those judgments entered for the defendants and to enter judgments for the plaintiff. Federal Savings & Loan Ins. Corp. v. Kearney Trust Co., 151 F.2d 720 (8th Cir. 1945).