**GULF FEDERAL SAVINGS & LOAN ASSOCIATION (Pelican Homestead & Savings Association)**

v.

**William M. MULDERIG.**

Civ. A. No. 87–3503.

United States District Court,
E.D. Louisiana.

March 10, 1989.
Reasons for Judgment June 14, 1989.

Paul G. Pastorek, F. Lee Butler, Adams and Reese, New Orleans, La., for plaintiff.

Monica T. Surprenant, Baldwin & Haspel, Metairie, La., for Pelican Homestead.

William M. Mulderig, Tallman, N.Y., pro se.

Richard T. Simmons, Jr., Hailey, McNamara, Hall, Larmann & Papale, Metairie,

La., for third-party defendants, Mmahat & Duffy, and John A. Mmahat.

## ORDER & REASONS

CHARLES SCHWARTZ, Jr.,
Bankruptcy Judge.

This matter is before the Court on three motions of the plaintiff: a motion for leave to file first supplemental and amending complaint, a motion for summary judgment dismissing the affirmative defense and counterclaims of the defendant, and a motion for summary judgment in the amount due on Continuing Guarantees sued upon. The Court originally set these matters for hearing on November 9, 1988. However, on November 16, 1988, pursuant to telephone conferences by the Court with counsel for the parties, the Court took these matters under submission without oral argument.

## I.

The facts and circumstances of this case stem from four loans granted to companies owned by the defendant, William M. Mulderig, by the plaintiff, Gulf Federal Savings & Loan Association, formerly Gulf Federal Savings Banks ("Gulf Bank").[1] Gulf Bank loaned to K & K Financial Services Ltd. ("K & K") the sum of two million one hundred sixty-nine thousand and no/100 ($2,169,000.00) dollars, pursuant to K & K's execution of a promissory note dated December 28, 1984 in favor of Gulf Bank. Similarly, Gulf Bank loaned to Dermul Management Ltd. ("Dermul") the sum of two million six hundred thirty-two thousand seven hundred thirty and no/100 ($2,632,730.00) dollars, for which Dermul executed a promissory note dated December 28, 1985 in favor of Gulf Bank. Finally, Gulf Bank loaned to W.M.M. Associates Ltd. ("WMM") the sum of fifty-four thousand four hundred and no/100 ($54,400.00) dollars, pursuant to WMM's execution of a

promissory note dated August 8, 1983, in favor of Gulf Bank. Gulf Bank also loaned to WMM the sum of twenty-seven thousand and no/100 ($27,000.00) dollars, for which WMM executed a promissory note in favor of Gulf Bank dated August 8, 1983. The defendant executed Continuing Guarantee Agreements for all four loans; he thus obliged himself personally and individually for certain stated amounts due.[2] Neither Gulf Bank nor defendant disputes the existence of these promissory notes and Continuing Guarantee Agreements, only their enforceability and the amount due on each.

It is further uncontested that on November 21, 1986, the Federal Home Loan Bank Board appointed the Federal Savings & Loan Insurance Corporation ("FSLIC") as receiver for Gulf Bank; FSLIC promptly transferred most of Gulf Bank to Gulf Federal Savings & Loan Association, which subsequently merged into Pelican Homestead and Savings Association ("Pelican").

All of the companies owned by the defendant eventually defaulted on the promissory notes, at which time the plaintiff made amicable demand upon the companies to cure the defaults. None did, and the plaintiff filed suit to foreclose on the properties involving K & K and Dermul. The plaintiff subsequently sold at various sheriff auctions the real property securing the K & K and Dermul notes. Credits stemming from the sale were applied to the K & K and Dermul loans. Because the defendant refused to pay on the amounts owing on those credited loans and the WMM loans, the plaintiff filed a Complaint for Monies Owed on the Continuing Guarantees.

In his answer, the defendant set forth an affirmative defense and counterclaims questioning not the existence of the notes and Continuing Guarantee Agreements but rather their enforceability and validity. Essentially, the defendant Mulderig claims there existed a "total plan" between the

---

1. Gulf Federal Savings & Loan Association later merged with Pelican Homestead and Savings Association.

2. The amounts due on the guarantees are $2,164,296.00 for the K & K loan, $850,000.00

for the Dermul loan, $53,800.00 for the first WMM loan, and $11,188.00 for the second WMM loan, plus interest, attorney's fees and costs, as specified in the promissory notes.

officers of Gulf and the defendant of which the notes and guarantees constituted only a part. Mulderig claims Gulf Bank fraudulently induced him to participate in certain transactions related to the loans and that therefore no consideration for the loans can exist. The plaintiff seeks summary judgment on these matters and the Continuing Guarantee Agreement.

## II.

### A.

While the defendant objects to the motion for leave to file first supplemental and amending complaint on the ground that Pelican's presence in the lawsuit could prejudice him, he fails to state, with supporting documentation, how this would occur. Accordingly, the Court grants the plaintiff's motion to substitute as plaintiff Pelican for Gulf Federal Savings & Loan Association. The latter no longer exists as it has merged into the former; as well, Pelican is now the successor in interest to and holder of all loans, notes, and agreements originally executed in favor of Gulf Federal Savings & Loan Association.

### B.

■ As stated, the defendant alleges that certain bank officers of Gulf Bank fraudulently induced him to participate in the disputed loan agreement. Therefore, he reasons, no consideration exists for the notes, and the guarantees are thus invalid. However, a debtor can never defend against a note (once held by the Federal Deposit Insurance Corporation [FDIC]) on the grounds that there existed some separate agreement between the lender and borrower which contradicts the written terms of loan documents. *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). The Supreme Court found in *D'Oench,* 315 U.S. at 457, 62 S.Ct. at 679, "a federal policy [under the National Banking Act] to protect [the FDIC], and public funds it administers, against misrepresentation as to the securities or other assets in the portfolios of the bank which [it] insures or to which it makes loans." The *D'Oench* doctrine ex-

plicitly addresses all persons who involve themselves in secret agreements with banks and estops them from asserting the terms of such agreements to nullify the effect of other written binding obligations.

Congress statutorily enshrined this doctrine at 12 U.S.C. section 1823(e), which reads in relevant part:

> No agreement which tends to diminish or defeat the right, title, or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

As well, the Supreme Court in *Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 401, 98 L.Ed.2d 340, 347 (1987), stated that any agreements reached by the parties relating to a note must be contemporaneously executed and officially recorded with the making of the note.

Although section 1823(e) explicitly applies only to the FDIC, the Courts have extended the *D'Oench* doctrine to FSLIC as well. *FSLIC v. Kroenke,* 858 F.2d 1067, 1070 (5th Cir.1988); *FSLIC v. Lafayette Investment Properties, Inc.,* 855 F.2d 196, 198 (5th Cir.1988). Further, "the Courts have construed [section 1823(e)] to include agreements made by defendants in good faith, and, in some cases, agreements obtained by the fraud of bank officers." *FSLIC v. Hsi,* 657 F.Supp. 1333, 1337 (E.D. La.1986). *See also FDIC v. Lattimore Land Corp.,* 656 F.2d 139, 142 (5th Cir. 1981). Similarly, neither do claims of fraud constitute valid defenses under the *D'Oench* Doctrine. *FDIC v. Cardinal Oil Well Servicing Co.,* 837 F.2d 1369, 1372

(5th Cir.1988); *FDIC v. McClanahan*, 795 F.2d 512 (5th Cir.1986).

Further, as a successor in interest to FSLIC, Pelican may rely upon the *D'Oench* doctrine. The public policy found in *D'Oench, supra*, as well as the jurisprudence, dictate this. In *Bryan v. Bartlett*, 435 F.2d 28, 32 (8th Cir.1970), *cert. denied*, 402 U.S. 915, 91 S.Ct. 1373, 28 L.Ed.2d 658 (1971), the Court utilized the *D'Oench* doctrine to provide the receiver of an insolvent, defrauded financial services corporation protection from such defenses as lack of delivery of promissory notes as well as want of consideration for them. The Court reasoned that the receiver of the corporation constituted a "federal officer" as a federal court had appointed him, and, "[i]n unsnarling the tangled affairs of these corporations to preserve insofar as possible assets for distribution to the defrauded investors, the receiver is performing a federal function." *Bryan v. Bartlett, supra*, 435 F.2d at 32. Similarly, in *Duttine v. Savas*, 455 F.Supp. 153, 158 (S.D.W.Va. 1978), *aff'd*, 612 F.2d 841 (4th Cir.1979), the Court allowed the trustee of a bankrupt industrial savings and loan corporation (due payments on promissory notes of the defendant) *D'Oench* doctrine protection from defenses based on lack of delivery and no consideration. Again, the Court noted the strong public policy imperative of *D'Oench* in protecting the national banking system: "Public policy requires that a person who, for the accommodation of the bank, executes an instrument which is in form a binding obligation, should be estopped from thereafter asserting that simultaneously the parties agree that the instrument should not be enforced." *Duttine v. Savas, supra*, 455 F.Supp. at 158.

The strong public policy imperatives found in *Bryan, supra*, and *Duttine, supra*, are no less important (and perhaps more so) for successors in interest to FSLIC than they are for trustees and receivers of bankrupt or insolvent corporations. *See, e.g., State Savings & Loan Ass'n. of Lubbock v. Kenney*, No. C–85–5261 (N.D.Calif. March 19, 1987). The Supreme Court created the *D'Oench* doctrine to promote stability in the banking system

by protecting the FDIC and FSLIC from shady and dishonest borrowers attempting to avoid their liabilities through claims of secret agreements which contradict the terms of the written loan agreement. If the *D'Oench* doctrine were unavailable to successor banks of the FDIC and FSLIC, then these agencies would have great difficulty in finding such banks due to the obvious risks involved for any succeeding banks.

■ Consequently, under *D'Oench* and its progeny, the alleged fraudulent inducement and lack of consideration by Gulf Bank's officers claimed by the defendant constitute no defense to the enforceability of the Continuing Guarantee Agreements. However, besides fraud and lack of consideration, the defendant claims three other defenses. All are specious. First, the defendant alleges that FSLIC possessed knowledge of his fraud claims when it took over Gulf Bank in November 1986 and that this obviates the *D'Oench* doctrine and the application of section 1823(e). This is not the law. "[K]nowledge of the misrepresentation by the FDIC prior to its acquisition of the note is not relevant to whether section 1823(e) applies." *Langley*, 108 S.Ct. at 396 (1987). Because of the public policy inherent in the *D'Oench* doctrine and section 1823(e), such rules extend to FSLIC as well. *See, e.g., FSLIC v. Lafayette Investment Properties, Inc., supra*, 855 F.2d at 198.

■ Second, the defendant argues that there exists a secondary oral agreement to extend the K & K loan by thirty years, that the mortgage contains no such provision, and that, therefore, the guarantees were never validly "delivered." Mulderig offers as documentation two letters: one from him to Michael P. Farley, Gulf Bank's former loan officer, and one from Farley to Valerie Oxner, counsel for Gulf Bank. Although Farley requests an extension of the mortgage, the mortgage does not contain such a provision. Because side agreements not contained in the mortgage constitute no defense, Mulderig's lack of delivery defense must fail. *Id.*

Finally, the defendant also objects to the enforceability of the two WMM loans. Mulderig claims that payments made on the WMM loans in December 1985 somehow renewed the loan accounts and therefore no liability on the guarantees exist for him. However, the defendant offers no evidence of any such payment and, in a letter dated December 31, 1985, J.D. Martin, Executive Vice President of Gulf Bank, rejected any kind of unilateral conditions suggested by Mulderig regarding payment on the loans.

The defendant clearly fails to raise an issue of genuine material fact; the facts and issues raised constitute no defense statutorily or jurisprudentially. The Court therefore grants the plaintiff's motion for summary judgment on the affirmative defense and counterclaims.

## C.

 Louisiana law unquestionably states that in a suit for collection of a promissory note and guaranty, the plaintiff may simply produce the notes sued upon to make out a prima facie case. *Humphrey v. Humbrecht*, 427 So.2d 461 (La.App. 5th Cir.), *writ denied*, 433 So.2d 1052 (La.1983); *Fontenot v. LaFleur*, 281 So.2d 868 (La. App. 3rd Cir.), *writ denied*, 284 So.2d 336 (La.1973). The plaintiff has done so. "Once the notes are introduced into evidence, the burden shifts to the defendant to establish the non-existence or extinguishment of the obligation." *Citizens Bank & Trust Co. v. Consolidated Terminal Warehouse, Inc.*, 460 So.2d 663, 672 (La.App. 1st Cir.1984). Though the defendant argues against the validity of the affidavit of Paul LaSalle, an executive with Gulf Bank now with Pelican, the defendant at no time denies signing the Continuing Guarantee Agreements nor does he deny their existence.

 The only other defense that the defendant offers relates to the amounts collectible on the guarantees. Regarding the K & K and Dermul loans, Mulderig claims that he is entitled to a credit for the amount of money received by Pelican for the sale of the foreclosed properties involved in the loan agreement (Pelican had previously purchased these properties at foreclosure for costs). The jurisprudence states otherwise: the measure of the plaintiff's recovery is based on the proceeds received for the property at foreclosure. *Gordon Finance Corp. v. Chambliss*, 236 So.2d 533 (La.App. 4th Cir.) *cert. denied*, 256 La. 869, 239 So.2d 364 (La.1970); *General Motors Acceptance Corp. v. Smith*, 399 So.2d 1285 (La.App. 4th Cir.1981). Regarding the first WMM loan, the defendant argues that a lesser amount is due because of a bill for the loan received in December 1987 for the amount of twenty-two thousand eight hundred eighty-nine and 13/100 ($22,889.13) dollars. Yet an affidavit presented by the plaintiff—unopposed by the defendant—emphasizes that the bank inadvertently sent out the bill and that in any case it does not propose to state the entire loan amount. While Mulderig provides documents showing credits on the second WMM loan, he submits no proof of payment, such as cancelled checks. And he at no time denies the validity of the amount asserted.

Because the defendant cannot dispute the existence of the Continuing Guarantee Agreements, he raises facts which question their amount. But under the jurisprudence, the facts raised by the defendant are not material facts. Thus, the Court grants the plaintiff's motion for summary judgment on the Continuing Guarantees.

Consequently, for the foregoing reasons, the Court hereby GRANTS the plaintiff's motions. Within ten (10) days of entry of this Order, plaintiff shall submit a proposed form of judgment.

## REASONS FOR JUDGMENT

This matter is before the Court for entry of final judgment following this Court's order granting summary judgment in plaintiff's favor. Plaintiff's proposed final judgment included a provision for an award of attorney's fees and in order to permit the assessment of such an award, plaintiff's counsel have submitted their billings and contemporaneous time records as required by the Local Rules.

This is a suit on four promissory notes and/or continuing guarantees in respect those notes. The notes were executed on identical forms which provide in pertinent part:

Should this note not be paid at maturity or when due or demandable, as herein provided, or should it become necessary to employ an attorney to enforce the same or recover the amount hereof or any portion of same, or should this note be placed in the hands of an attorney for collection or compromise or other action, for any reason, the maker(s) and any endorser(s), surety and/or guarantor(s) of this note, agree to pay the fees of the attorney who may be employed for that purpose, which fees are hereby fixed at twenty-five (25%) percent of the amount due or sued for, or claimed, or sought to be collected, preserved or enforced, plus all costs, but in no event less than [$1,000].

Counsel for plaintiffs have cited to the Court no authority requiring the Court to assess in this case the 25% fees provided in the note, which in this case would amount to a fee of approximately $1 million. Under the circumstances of this case, such a fee would be unconscionably high and unwarranted.

Accordingly, in furtherance of a determination of what fees should be recovered, this Court conducted a line by line review of counsel's time records, and in light of *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir.1974), the Court makes the following specific findings:

(1) Time and labor required: This was a relatively simple matter disposed of by motion. No particularly difficult legal issues were implicated nor were any onerous hearings or discovery involved. In the hands of a commercial litigation specialist, this matter would not require any undue time, nor would it require extensive conferences between attorneys in the same firm or extensive review of work. The Court regards such review as unnecessary duplication. The Court also finds it necessary to distinguish between such work as file organization and court runner time, which does not require any particular legal expertise, and time spent in legal research and preparing legal pleadings.

Accordingly, the Court finds a reduction in the number of hours for document organization and summary is appropriate. The Court also specifically disallows recovery for the total time spent in conference with office attorneys and between the offices of Adams & Reese and Baldwin & Haspel. This is not the type of complex case requiring extensive coordination of effort.

In light of these general findings, the Court adjusts the time allowed as indicated below. Where no comment is made, the time charged is deemed reasonable:

12/2–28/88, for file review and organization, 8 hours will be permitted;

11/8/88, for conference with Surprenant and other work, 4 hours will be permitted; and

11/9/88, reduction to 1 hour for conference with Surprenant.

During the 7/12/88 to 10/24/88 time period, there are numerous entries for conferences among office attorneys and counsel for plaintiff and overall, duplication of effort appears in repeated review of pleadings to be filed. Accordingly, the time for attorney Pastorek is reduced to 5 hours; the time for attorney Stern is reduced to 15 hours; and paralegal time is reduced to 40 hours.

Attorney Pastorek's time for 7/13/88 through 7/29/88 is reduced to 1.5 hours due to duplication.

Attorney Pastorek's time for 5/12/88 to 5/27/88 is reduced to 1.5 hours and Attorney Stern's time is reduced to 16.25 hours due to duplication.

No recovery is permitted for computer assisted legal research as this is considered as part of overhead.

Time expended on research and preparation of a motion to quash was deemed excessive. Accordingly, 4 hours each will be permitted for attorney Butler and the law clerk to prepare this motion.

Time expended on file organization, search for missing files and memoranda

364

should be disallowed. Accordingly, Butler time on the 9/1/87 billing is reduced to 5 hours; Attorney Pastorek's time for 6/9/87 is disallowed; Beaver's time for 6/9/87 is disallowed; Attorney Pastorek's time for 5/22/87 is disallowed; Attorney Pastorek's time for 3/24/87 is disallowed; and Beaver's time for 3/24/87 and 3/25/87 and 3/30/87 is disallowed.

Time expended by Baldwin & Haspel is reduced by one-half for duplication on the following dates: 3/14/88, 3/17/88, 3/28/88, 3/30/88, 3/31/88, 8/5/88, 8/7/88, 8/9/88, 10/9/88, 11/9/88, 11/14/88, and 11/28/88.

(2) The novelty and difficulty of the questions: As indicated above, the legal questions here presented are neither novel nor particularly difficult. Some legal research would be necessary, and recovery is permitted for reasonable amounts of time so expended.

(3) The issues here presented are better handled by lawyers with some experience in this field. The lawyers involved showed the requisite skill. However, the case requires no special additional award beyond a fair rate for reasonable time expended.

(4) This type of case would not preclude other employment.

(5) The Court finds the fees charged by Adams & Reese for their associates', partners' and law clerks' time to be within the customary and reasonable range. The fees charged by Baldwin & Haspel for this case are deemed excessive, and consistent with billing submitted by Baldwin & Haspel to this Court in connection with other matters and with the going rates in this area, the Court permits recovery of partner time at a rate of $130 per hour.

With respect to paralegal and court run time, the Court views the expenditure of such time as overhead. To rule otherwise would be to sanction sharing the practice of law with non-legal personnel. Accordingly the Court finds such time may be assessed only at a rate of $30 per hour, estimated with respect to the annual salary in this area for paralegals divided by a 40 hour work week for 48 weeks.

(6) The fees in this case are fixed and are deemed to be appropriately calculated with regard to actual time expended.

(7) This case involved no time limitations.

(8) The amount involved was $3,099,800 principal, plus interest exceeding $1 million. However, this amount was fixed by contract and given this was a simple suit on various notes, does not present any particular special considerations.

(9) The attorneys' reputations and experience justify the hourly rates allotted above.

(10) and (11) The case does not present any considerations due to undesirability or a special relationship with the client.

(12) Awards in similar cases: It is this Court's practice to review contemporaneous time reports and award the reasonable value of actual time reasonably expended, plus a small allowance for later proceedings. The Court has done so in this case, and no authority was cited to the Court requiring a different result.

For the foregoing reasons, the Court assesses attorneys fees for Adams & Reese's services in the amount of $20,082.25 and for Baldwin & Haspel's services in the amount of $5,275.40, with an additional amount of $2,500 for any appeal and enforcement of the judgment. This results in a total award of $27,857.65, which the Court views as bordering on excessive for a case involving primarily a motion for summary judgment.

The notes also permit recovery of "costs." Absent the citation of controlling authority to the contrary and any clarifying language in the notes, the Court concludes this reference to mean such "legal costs" as are usually recoverable by the prevailing party in a legal action. The Court also finds limitation of the awardable costs appropriate given the high fees assessed.

The Clerk of Court is directed to enter judgment in favor of the plaintiff in the amount of $3,099,800.28 principal, accrued $1,309,893.05 interest and attorney's fees

as indicated above, with defendant to bear all costs.