967 F.2d 340
 23 Fed.R.Serv.3d 421
 Carson Wayne NEWTON, Plaintiff-Appellant,
v.
UNIWEST FINANCIAL CORP., a corporation; United Savings Bank
of Wyoming, F.S.B. a Federal stock savings bank; Uniwest
Services Corp., a corporation; Federal Deposit Insurance
Corporation, an agency of the United States, as receiver for
Buena Vista Bank and Trust Co.; Gary H. McGill, Defendants-Appellees.
 No. 91-15329.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 14, 1992.
Decided June 23, 1992.
 
 Peter C. Bernhard, Schreck, Jones, Bernhard, Woloson & Godfrey, Las Vegas, Nev., for plaintiff-appellant.
 David W. Stark, Otten, Johnson, Robinson, Neff & Ragonetti, Denver, Colo., for defendants-appellees, Uniwest, et al.
 Jack M. Englert, Jr., Holland & Hart, Denver, Colo., for defendant-appellee, F.D.I.C.
 Before TANG, PREGERSON, and FERGUSON, Circuit Judges.
 Appeal from the United States District Court for the District of Nevada.
 TANG, Circuit Judge:
 
 
 1
 Carson Wayne Newton ("Newton") appeals from the district court's orders granting summary judgment in favor of defendants on both Newton's claims against them and defendants' counterclaims against Newton. The case arises from two investments Newton made in 1985. Although he now focuses on an alleged violation of a federal law prohibiting certain tying agreements, the gravamen of Newton's action in district court was securities fraud. Defendants' counterclaims were based on promissory notes that Newton gave in return for loans used to make the two investments. We conclude the district court properly applied D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), to bar both Newton's tying claim and his affirmative defense based on the alleged unlawful tying agreement. Therefore, we affirm.
 
 BACKGROUND
 
 2
 In 1985, Newton borrowed $200,000 from Buena Vista Bank & Trust Company ("Buena Vista") and $300,000 from United Savings Bank of Wyoming ("USB"), and executed a promissory note for each amount.[1] Newton used these loans to purchase stock offered by defendant Uniwest Financial Corporation ("Uniwest"). Uniwest is a savings and loan holding company of which USB was a subsidiary.
 
 
 3
 Upon acquiring the Uniwest stock, Newton assigned it as his capital contribution to a limited partnership. The partnership was set up to oversee the development of Fiesta RV ("Fiesta"), a recreational vehicle park in Arizona. Meanwhile, Fiesta arranged a $2,100,000 loan from USB for the purpose of acquiring property in Arizona. Unfortunately, Fiesta, Buena Vista, and USB subsequently suffered major financial setbacks: Fiesta declared bankruptcy, and both USB and Buena Vista were found to be insolvent.
 
 
 4
 The Federal Deposit Insurance Corporation ("FDIC") was appointed receiver for Buena Vista, thus acquiring Newton's note for $200,000. Similarly, the Federal Savings and Loan Insurance Corporation ("FSLIC") was appointed receiver for USB, and likewise acquired Newton's note for $300,000. Immediately upon becoming the receiver for USB, FSLIC transferred the assets and liabilities of USB, including Newton's $300,000 note, to Rocky Mountain, F.S.B. ("Rocky Mountain").
 
 
 5
 Newton filed this lawsuit in September, 1987, naming as defendants Uniwest, its various subsidiaries (including USB), Gary McGill, Mark Perlmutter, and Buena Vista. McGill was President of Uniwest; Perlmutter was its Chairman. Thereafter, the district court substituted the FDIC for Buena Vista and Rocky Mountain for USB.
 
 
 6
 Newton's first amended complaint contains eight counts. Counts one and two set forth the essence of Newton's legal attack, alleging various federal securities law violations based on purportedly false statements in Uniwest financial documents. Newton has abandoned these claims on appeal, however. Count four--the claim pertinent to this appeal--alleges that USB violated 12 U.S.C. § 1464(q) by conditioning its loan to Newton on the use of the loan proceeds to buy Uniwest stock.[2]
 
 
 7
 In response to the lawsuit, the FDIC counterclaimed to recover on the Buena Vista note, and Rocky Mountain counterclaimed to recover on the USB note. Newton replied by asserting as an affirmative defense that defendants' conduct, including the alleged unlawful tying agreement, barred the counterclaims.
 
 
 8
 After two years of discovery had transpired, the district court granted summary judgment in favor of defendants on all claims and counterclaims. In particular, as to the claim of an illegal tying agreement originally asserted against USB, the district court held that USB's successor-in-interest, Rocky Mountain, was absolved of liability by virtue of the doctrine enunciated in D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). Newton timely appeals, challenging the district court's judgment only in regard to its application of the D'Oench doctrine.
 
 DISCUSSION
 
 9
 * We review a grant of summary judgment de novo, in part to determine whether the district court properly applied the relevant substantive law. Tzung v. State Farm Fire & Casualty Co., 873 F.2d 1338, 1339-40 (9th Cir.1989).
 
 
 10
 Newton argues that the district court erred in holding that the rule announced by the Supreme Court in D'Oench barred Newton's action under 12 U.S.C. § 1464(q).[3] Newton maintains that under section 1464(q) he should be able to sue a failed savings and loan's successor-in-interest, even though the alleged unlawful tying agreement was not evident on the face of the institution's records at the time it was placed in receivership by the FSLIC. We disagree.
 
 
 11
 In D'Oench, the FDIC acquired a note as collateral securing a loan to a failed bank. 315 U.S. at 454, 62 S.Ct. at 678. When the FDIC sought to recover on the note, the defendant claimed that a separate agreement with the bank, not evident to the FDIC when it acquired the note, relieved defendant from liability. The Supreme Court held that the defendant "was responsible for the creation of the false status of the note in the hands of the bank." Id., 315 U.S. at 461, 62 S.Ct. at 681. Consequently, the defendant "cannot be heard to assert that the federal policy to protect [the FDIC] against such fraudulent practices should not bar its defense to the note." Id.
 
 
 12
 The Court thus implemented a "federal policy to protect [the FDIC] and the public funds which it administers against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures or to which it makes loans." Id. at 457, 62 S.Ct. at 679. In doing so, the Court noted:
 
 
 13
 Plainly one who gives such a note to a bank with a secret agreement that it will not be enforced must be presumed to know that it will conceal the truth from the vigilant eyes of the bank examiners.... The test is whether the note was designed to deceive the creditors or the public authority or would tend to have that effect. It would be sufficient in this type of case that the [note] maker lent himself to a scheme or arrangement whereby the banking authority on which [the FDIC] relied in insuring the bank was or was likely to be misled.
 
 
 14
 Id. at 460, 62 S.Ct. at 680-81.
 
 
 15
 We recently considered the D'Oench doctrine in Federal Sav. & Loan Ins. Corp. v. Gemini Management, 921 F.2d 241 (9th Cir.1990). In that case, defendant Gemini Management obtained financing from Centennial Savings and Loan Association for Gemini's proposed social club in San Francisco. The first loan agreement, which was never signed, discussed a loan of $1.5 million. This agreement contained an integration clause. The second loan agreement discussed a loan of only $1.1 million; the agreement contained no integration clause.
 
 
 16
 Responding to Gemini's protests against the reduction in amount, Centennial offered assurances that an additional amount covering the shortfall would be forthcoming. Thus, relying on these oral assurances and on the absence of an integration clause in the second agreement, Gemini believed that there was still an agreement to finance the entire project with a loan of $1,545,000 and so agreed to the terms of the second agreement. Centennial, however, failed to provide the additional amount, and the social club subsequently failed.
 
 
 17
 When FSLIC, as receiver for Centennial, sued Gemini on its note, Gemini asserted Centennial's breach of the agreement both in an affirmative defense and in a counterclaim. We held that the first agreement, which remained unsigned, did not provide a basis for Gemini's claims and that D'Oench barred Gemini's claims insofar as they are based on an agreement not memorialized in Centennial's records. 921 F.2d at 246.
 
 
 18
 The Gemini decision is sweeping. In reaffirming the vitality of the D'Oench doctrine, we observed that "FSLIC's ability to evaluate the financial condition of troubled thrift institutions depends, now more than ever, upon the protective shield of D'Oench." Id. at 245. Our decision in Gemini thus extended D'Oench to cover FSLIC, not only stripping defendants of certain defenses asserted in response to FSLIC's claims, but also shielding FSLIC from defendant's counterclaims. See also Kilpatrick v. Riddle, 907 F.2d 1523, 1528 (5th Cir.1990) ("defenses framed as causes of action must also be barred, because any other result would nullify the doctrine"), cert. denied, --- U.S. ----, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991).
 
 
 19
 We have discussed the D'Oench doctrine in only three other cases: FDIC v. Bank of San Francisco, 817 F.2d 1395 (9th Cir.1987); FDIC v. First Nat'l Fin. Co., 587 F.2d 1009 (9th Cir.1978); and FDIC v. Meo, 505 F.2d 790 (9th Cir.1974). The Bank of San Francisco case is not relevant here because the note maker was not a party to the action. Rather, the dispute concerned a letter of credit, which we deemed "sui generis." 817 F.2d at 1398.
 
 
 20
 In Meo, we declined to apply the D'Oench doctrine to a case where the FDIC sued on a note given to a bank in payment for stock in the bank. 505 F.2d at 791. The bank erroneously issued voting trust certificates, rather than stock, resulting in a failure of consideration. Id. Nevertheless, the district court barred Meo's defense to the FDIC's action on the note because, in essence, the bank's mistake would not have been apparent to bank examiners. See id. We reversed because Meo never saw the certificates issued by the bank; he was "completely innocent." Id. at 791, 792 & n. 2; cf. D'Oench, 315 U.S. at 461, 62 S.Ct. at 681 (party sued by FDIC was "responsible for the creation of the false status of the note").
 
 
 21
 Finally, in First National, we dealt with facts very much like those in D'Oench itself. The FDIC brought an action to recover on certain notes. First National Finance Company defended on the ground that the president of the failed bank " 'expressly stated ... that this was an accommodation loan and that [First National] would [not] be required to repay the said note, and that it was being made for the benefit of assisting [the failed bank] ... in completion of certain bookkeeping corrections.' " 587 F.2d at 1011 (quoting affidavit). In barring this defense under the D'Oench doctrine, we distinguished Meo on the basis that in Meo there existed no "secret agreement with the bank which permitted the bank to overstate its assets." Id. at 1012. We also held that the note maker need have no specific knowledge of a deceptive scheme: "[I]t is sufficient that he lends himself to a scheme to aid the bank in concealing the true nature of the transaction, thus misrepresenting the note as a valid asset of the bank." Id. Furthermore, in deciding whether to apply D'Oench, the First National court rejected any distinction based on whether the FDIC was acting in its corporate capacity, or in its capacity as a receiver. Id.; see also Hymanson, supra note 3, at 259-63 (discussing two capacities in which FDIC may operate).
 
 
 22
 We see little reason not to apply the D'Oench doctrine in the present case. The alleged tying agreement on which Newton premises count four of his complaint, as well as his affirmative defense to Rocky Mountain's counterclaim, was not memorialized in the records of USB, Rocky Mountain's predecessor. Instead, the alleged agreement existed, if at all, only in the form of an oral condition on the USB loan.[4] And contrary to Newton's assertion, this is not a case like Meo where the note maker was "completely innocent." Newton was necessarily aware of the alleged condition on the loan.[5] Indeed, Newton "len[t] himself to a scheme to aid the bank in concealing the true nature of the transaction." First National, 587 F.2d at 1012. Because the agreement that allegedly violates 12 U.S.C. § 1464(q) was not apparent from the face of USB's records, "FSLIC's ability to evaluate the financial condition of [the] troubled thrift institution[ ]" was impaired. Gemini, 921 F.2d at 245. As in Gemini, FSLIC is entitled to the protection of the D'Oench doctrine.
 
 
 23
 The one court that has considered application of the D'Oench doctrine to actions under 12 U.S.C. § 1464(q) has come to the same conclusion. In Yankee Bank for Fin. & Sav., FSB v. Task Assocs., Inc., No. 88-CV-224, 1989 WL 87430 (N.D.N.Y. Aug. 4, 1989), the FDIC sought to foreclose on a mortgage held on premises being developed by Task Associates. Id. at * 1-2. Task had mortgaged the premises to the failed bank to secure an initial loan of $2.6 million. Id. at * 1. Thereafter, Task claimed that Yankee Bank made an oral commitment to loan Task an additional $1,900,000. Id. at * 2. This additional loan was intended to finance the second phase of development, upon which the economic feasibility of the entire project allegedly depended. Id. While waiting for this second amount, Task began the second phase of development, using money intended to be spent on the first phase.
 
 
 24
 Yankee Bank later informed a Task corporate officer that the bank would not make the additional loan for $1,900,000 unless the officer personally guaranteed that loan, and unless he made other concessions on two unrelated projects. Id. at * 2. After shutting down development for three months, the officer concluded he had no choice but to accede to the bank's demands. Id. Once the officer provided the required guarantee, Yankee Bank made the additional loan, and the additional debt was incorporated into the original mortgage. Id. at * 2-3. When Task failed to make payments on the mortgage, Yankee Bank--and then FDIC as receiver for the bank--sought to foreclose. Id. at * 3-4. In the foreclosure action, Task filed a counterclaim against FDIC alleging an unlawful tying agreement in violation of 12 U.S.C. § 1464(q). Id. at * 4.
 
 
 25
 In granting summary judgment in favor of FDIC on this counterclaim, id. at * 16, the district court reasoned:
 
 
 26
 Presumably [Task's] theory is that Yankee Bank engaged in ... unlawful conduct by requiring a $1,000,000.00 personal guarantee from [Task's officer] before it would provide [Task] with the additional $1,900,000.00 loan.
 
 
 27
 Assuming for the sake of argument that a "tying" claim can be alleged against the FDIC, the court agrees with the FDIC, that such claim must fail here because it is in essence based upon Yankee Bank's alleged oral commitment to provide additional financing to [Task]. As discussed herein, the D'Oench doctrine prohibits such oral representations from being enforced against the FDIC. It would be wholly inconsistent to allow an anti-competitive tying claim to be asserted against the FDIC, when the very basis for such a claim could not be asserted against the FDIC.
 
 
 28
 Id. at * 13.
 
 
 29
 Our decision to apply the D'Oench doctrine in this case is reinforced by decisions concerning a similar issue arising in the context of the anti-tying provisions of 12 U.S.C. § 1972. We have explained that section 1972 bears a "very close relationship" to the anti-tying provision at issue here, section 1464(q). Sundance Land Corp. v. Community First Fed. Sav. & Loan Ass'n, 840 F.2d 653, 658-59 (9th Cir.1988); see also Amerifirst Properties, Inc. v. FDIC, 880 F.2d 821, 824 n. 7 (5th Cir.1989) (noting that the two statutes are equivalents). Thus, it is significant that, in an action against the FDIC as receiver of a failed bank, a district court has held an illegal tying claim under section 1972 to be barred by the statutory analogue of the D'Oench doctrine, 12 U.S.C. § 1823(e). Diamond v. Union Bank & Trust, 776 F.Supp. 542, 543 (N.D.Okla.1991) ("[I]t is undisputed that the claim involves an unwritten agreement. Accordingly, under 12 U.S.C. § 1823(e) it is unenforceable against the FDIC.") (citing FDIC v. Eagle Properties, Ltd., 664 F.Supp. 1027, 1054 n. 5 (W.D. Tex.1985)); see also FDIC v. Linn, 671 F.Supp. 547, 555 & n. 16 (N.D.Ill.1987) (speculating that claim under section 1972 may be barred by section 1823(e)). Although the Diamond court relied on section 1823(e), rather than the D'Oench doctrine, "section 1823(e) was meant to offer as much protection as the common law rule in D'Oench." Gemini, 921 F.2d at 245 n. 4; see also Hymanson, supra note 3, at 269-74 (discussing interrelation of section 1823(e) and the D'Oench doctrine).
 
 
 30
 Newton's principal argument in response is that the D'Oench doctrine should not apply to a claim or defense based on a separate and independent federal statutory violation, rather than on just a secret agreement. As the Yankee Bank court recognized, however, a violation of section 1464(q) is not entirely separate from the "secret agreements" with which D'Oench is concerned. If the unlawful tying agreement is not memorialized in the records of the financial institution, "[i]t would be wholly inconsistent to allow an anti-competitive tying claim to be asserted against the [government financial institution], when the very basis for such a claim could not be asserted against the [same institution]." Yankee Bank, 1989 WL 87430, at * 13.[6] Thus, we believe the D'Oench doctrine is properly extended to apply here. Cf. Vernon v. Resolution Trust Corp., 907 F.2d 1101, 1107 (11th Cir.1990) (declining to extend D'Oench to case where parties suing financial institution were not obligees trying to avoid their commitment on a particular debt or monetary obligation owed to the failed bank).
 
 
 31
 Contrary to another of Newton's arguments, we do not interpret Congress's failure to accompany the enactment of section 1464(q) with a codification of the D'Oench doctrine as indicating an intent to repeal D'Oench insofar as section 1464(q) is concerned. The Ninth Circuit and other courts have rejected a similar argument made with regard to the enactment of 12 U.S.C. § 1823(e). See Gemini, 921 F.2d at 245 n. 4 (indicating that section 1823(e) and the D'Oench doctrine coexist); Yankee Bank, 1989 WL 87430, at * 6-7 (rejecting preemption argument); Hymanson, supra note 3, at 270 ("preemption could be considered a nonissue, with the exception that borrowers continue to raise it"). Without affirmative evidence of Congress's intent, it would be inconsistent to adopt such a position with regard to section 1464(q). Accordingly, we reject Newton's argument here.
 
 
 32
 Newton also argues that, even if the D'Oench doctrine protects FSLIC against his claim of illegal tying, the doctrine should not protect Rocky Mountain. Yet Newton cites no authority for this argument. Indeed, Newton's position runs contrary to persuasive authority indicating that the D'Oench doctrine does extend to FSLIC's successors-in-interest. See Porras v. Petroplex Sav. Ass'n, 903 F.2d 379, 381 (5th Cir.1990) ("Claims and defenses barred as to the FSLIC by the D'Oench, Duhme doctrine are similarly barred as to private parties who purchase the assets of the failed institution from the FSLIC."); FDIC v. Texas Country Living, Inc., 756 F.Supp. 984, 987 (E.D.Tex.1990); Gulf Fed. Sav. & Loan Ass'n v. Mulderig, 742 F.Supp. 358, 361 (E.D.La.1989).
 
 
 33
 These decisions are consistent with the sweeping language of our decision in Gemini, where we expressed concern that the government's financial institutions be able to perform their services efficiently, particularly during the current savings and loan crisis. See Gemini, 921 F.2d at 245. As the court in Mulderig stated: "If the D'Oench doctrine were unavailable to successor banks of the FDIC and FSLIC, then these agencies would have great difficulty in finding such banks due to the obvious risks involved for any succeeding banks." 742 F.Supp. at 361; see also Porras, 903 F.2d at 381 ("Extending D'Oench, Duhme to transferees of assets from the FSLIC ... provides the FSLIC with greater opportunity to protect the failed institution's assets."). Accordingly, we extend the protection of the D'Oench doctrine to Rocky Mountain.
 
 
 34
 Finally, Newton argues that there is no secret agreement on which to base application of the D'Oench doctrine because the agreement was made under duress. However, Newton points to no evidence supporting his allegation of duress or compulsion. Furthermore, even if there was economic duress, this would make the agreement voidable, not void. See, e.g., Cumberland & Ohio Co. v. First Am. Nat'l Bank, 936 F.2d 846, 850 (6th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 878, 116 L.Ed.2d 783 (1992); Diamond, 776 F.Supp. at 543. Thus, as to an agreement that would be merely voidable, the D'Oench doctrine remains applicable. See Langley v. FDIC, 484 U.S. 86, 94, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1987) (FDIC remains entitled to protection of 12 U.S.C. § 1823(e) when agreement is voidable, not void).
 
 
 35
 In sum, the district court correctly applied the D'Oench doctrine to bar Newton's tying claim and his affirmative defense based on the alleged unlawful tying agreement.
 
 II
 
 36
 Both FDIC and Rocky Mountain request attorney's fees on appeal under the terms of the promissory notes. We remand these requests for review by the district court. See 9th Cir. R. 39-1.8.
 
 
 37
 Appellee McGill also seeks attorney's fees as a sanction under Fed.R.App. P. 38 for being made to respond to an appeal which does not concern him. Newton's reason for appealing the district court's judgment as to McGill was "to preserve [Newton's] rights against McGill on remand."
 
 
 38
 This case has been pending since 1987. Discovery alone spanned two years. Prior to taking this appeal, Newton had ample time in which to amend, or seek leave to amend, his complaint to allege new legal theories of liability against McGill and other defendants. Taking an otherwise needless appeal hardly makes it more likely that Newton would be permitted to allege new claims against McGill on remand.
 
 
 39
 Newton should have indicated in his notice of appeal that he was not appealing those portions of the district court's judgment concerning McGill. See Fed.R.App. P. 3(c) ("The notice of appeal ... shall designate the judgment, order or part thereof appealed from....") (emphasis added). At the very least, Newton should have notified McGill of the purpose of including him in the appeal before McGill was required to brief the merits before us. Newton did not make this disclosure until his reply brief, however.
 
 
 40
 Because the merits of Newton's appeal are frivolous insofar as McGill is concerned, McGill is entitled to an award of attorney's fees for being made to file a substantive brief with this court. We remand to the district court for a determination of the amount of fees to be awarded to McGill.
 
 CONCLUSION
 
 41
 We affirm the district court's decision dismissing Newton's claim for illegal tying arrangements. We remand the case to the district court for a determination of fee awards.
 
 
 42
 AFFIRMED and REMANDED.
 
 
 
 [1]
 The USB loan was actually made by a subsidiary of USB, Uniwest Services Corporation. Eventually, the note was acquired by USB's successor-in-interest. For simplicity, we refer to USB as the original creditor
 
 
 [2]
 Section 1464(q) provides in pertinent part:
 A savings association may not in any manner extend credit, lease, or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement--
 (A) that the customer shall obtain additional credit, property, or service from such savings association, or from any service corporation or affiliate of such association, other than a loan, discount, deposit, or trust service;
 (B) that the customer provide additional credit, property, or service to such association, or to any service corporation or affiliate of such association, other than those related to and usually provided in connection with a similar loan, discount, deposit, or trust service; and
 (C) that the customer shall not obtain some other credit, property, or service from a competitor of such association, or from a competitor of any service corporation or affiliate of such association, other than a condition or requirement that such association shall reasonably impose in connection with credit transactions to assure the soundness of credit.
 12 U.S.C. § 1464(q)(1).
 
 
 [3]
 Newton also refers to the holder in due course doctrine as a possible bar to his tying claim. For purposes of this appeal, it is not necessary to distinguish between this doctrine and the doctrine enunciated in D'Oench. See FDIC v. Bank of San Francisco, 817 F.2d 1395, 1398 (9th Cir.1987) ("D'Oench itself treated the FDIC as a holder in due course"); cf. Marsha Hymanson, Note, Borrower Beware: D'Oench, Duhme and Section 1823 Overprotect the Insurer When Banks Fail, 62 S.Cal.L.Rev. 253, 299-302 (1988) (hereinafter "Hymanson") (discussing differences between two doctrines)
 
 
 [4]
 Newton contended at oral argument that, although not immediately evident from the face of USB's records, sufficient evidence existed to notify bank examiners of the tying agreement. This is not enough. Unless some clear statement of the agreement itself is accessible to the examiners, the agreement is "secret" for purposes of the D'Oench doctrine. See Gemini, 921 F.2d at 245 ("D'Oench and its progeny require a clear and explicit written obligation")
 
 
 [5]
 If Newton was truly compelled to accept the alleged condition on the loan, Meo might be more relevant. But see Yankee Bank for Fin. & Sav., FSB v. Task Assocs., Inc., No. 88-CV-224, 1989 WL 87430, at * 13 (N.D.N.Y. Aug. 4, 1989) (applying D'Oench doctrine to bar action under 12 U.S.C. § 1464(q) despite some evidence of compulsion; district court did indicate, however, that bank's acts might be "appropriate traditional banking practice" rather than improper compulsion)
 
 
 [6]
 It is precisely because Newton's claim involves a secret agreement that the D'Oench doctrine, rather than just the federal holder in due course doctrine, applies in this case. See Resolution Trust Corp. v. Montross, 944 F.2d 227, 228-29 (5th Cir.1991) (en banc), reinstating in part Sunbelt Sav., FSB v. Montross, 923 F.2d 353 (5th Cir.1991); Hymanson, supra note 3, at 300-02
 Nevertheless, Newton argues that, under the decision of the three-judge panel in Montross, Rocky Mountain is not entitled to holder in due course status because Newton's note is non-negotiable. We reject this argument. Newton's only basis for contending that his note is non-negotiable is that it was allegedly a variable interest rate note. Even if this were true, the en banc decision in Montross effectively withdrew statements in the original decision indicating that variable interest rate notes are per se non-negotiable. 944 F.2d at 228.